CONSOLIDATED EXPRESS,
INC., Appellant,

v.

NEW YORK SHIPPING ASSOCIATION, INC., Sea-Land Services, Inc., Seatrain Lines Inc., International Longshoremen's Association, AFL–CIO, International Terminal Operating Co., Inc., John M. McGrath Corp., Pittston Stevedoring Corp., United Terminals Corp., Universal Maritime Services Corp.

TWIN EXPRESS, INC., Appellant,

v.

NEW YORK SHIPPING ASSOCIATION, INC., Sea-Land Service, Inc., International Longshoremen's Association, AFL–CIO, International Terminal Operating Co., Inc., John M. McGrath Corp., Pittston Stevedoring Corp., United Terminals Corp., Universal Maritime Services Corp.

Nos. 78–1529, 78–1530.

United States Court of Appeals,
Third Circuit.

Argued Nov. 14, 1978.

Decided April 16, 1979.

As Amended May 18, 1979.

---

Richard A. Whiting (argued), Mark F. Horning, Ellen M. McNamara, Steptoe & Johnson, Washington, D. C., John A. Ridley, Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for appellants.

Ernest L. Mathews, Jr. (argued), Gleason, Laitman & Mathews, New York City, for International Longshoremen's Association, AFL–CIO.

C. P. Lambos, Donato Caruso (argued), Lorenz, Finn, Giardino & Lambos, New York City, Michael S. Waters, Carpenter, Bennett & Morrissey, Newark, N. J., for appellees New York Shipping Association, Inc., International Terminal Operating Co., Inc., John M. McGrath Corp., Pittston Stevedoring Corp. and Universal Maritime Service Corp.

James W. B. Benkard (argued), Paul H. Karlsson, Mary M. Hoag, Davis, Polk & Wardwell, New York City, Jeffrey Reiner, Meyner, Landis & Verdon, Newark, N. J., for appellee Sea-Land Service, Inc.

Before SEITZ, Chief Judge, and GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

We here review an order denying plaintiffs' motion for partial summary judgment on issues of liability in a suit pleading causes of action under § 303 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 187, and § 4 of the Clayton Act, 15 U.S.C. § 15. The order is before us on an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The district court, 452 F.Supp. 1024, identified four controlling questions of law which in its view were worthy of interlocutory review, and a panel of this court granted leave to appeal. Before this court the parties have addressed those questions as well as other considerations which are urged in support of and in opposition to the district court's ruling. We reverse the court's order denying summary judgment on the § 303(b) claim. Because we conclude that material issues of fact may remain regarding the availability of the non-statutory labor exemption to the antitrust laws we affirm the denial of summary judgment on the antitrust claim.

## I. THE FACTS

### A. The Parties and their Businesses

The plaintiffs are Consolidated Express, Inc. (Conex) and Twin Express, Inc. (Twin). They are non-vessel owning common carriers engaged in the business of consolidating less than container load (LCL) or less than trailer load (LTL) cargo for shipment between Puerto Rico and the Port of New York (the Port). At their off-pier facilities, they pack the shipments of several customers into large containers which are then trucked to pierside facilities and loaded on board ship. The defendant New York Shipping Association (NYSA) is an association of employers who engage in various businesses related to the passage of freight through the Port. On behalf of its members NYSA conducts collective bargaining negotiations and enters into collective bargaining agreements with various labor organizations, including the defendant International Longshoremen's Association, AFL–CIO (ILA), a labor organization representing longshoremen in the Port. Defendants International Terminal Operating Co., Inc., John M. McGrath Corp., Pittston Stevedoring Corp., United Terminals Corp., and Universal Maritime Services Corp. (the stevedores) are members of NYSA and employers of ILA longshoremen. They provide stevedoring services to vessels in the Port. Defendants Sea-Land Service, Inc. and Seatrain Lines, Inc. (the vessel owners) are operators of vessels engaged in common carriage by water between the Port and Puerto Rico. Their vessels are designed for the accommodation of large containers. As a part of their business they furnish shippers with containers and trailers for use on board their ships, as well as terminal facilities. They also provide stevedoring services for cargo shipped on their vessels, and thus, like the stevedores, employ ILA longshoremen.

### B. Pre-litigation History

Until shortly after World War II most dry cargo was crated by the shipper, delivered to the pier by rail or truck, and loaded into a vessel piece-by-piece by longshoremen. That method of cargo handling has now generally been replaced by the use of vessels specially designed to accommodate mammoth containers. The cargo of large volume shippers may fill one or more containers. That of lower volume shippers is consolidated with the cargo of others in a single container. Many of these containers, when removed from the vessel, serve as semi-trailers, and virtually all are readily shipped by truck. Thus they can be loaded or unloaded ("stuffed" or "stripped" in longshoreman parlance) at sites remote from the pier. This innovation has increased productivity in the movement of cargo by water, but has produced a decline in the demand for longshoreman labor.

When in 1958 ILA struck the members of NYSA, a central issue was the growing use of containers on the docks. The strike was not, however, successful in prohibiting their use, and in the ILA–NYSA contract adopted in 1959 ILA conceded that "any employer shall have the right to use any and all types of containers without restrictions." In the next decade fully containerized ships were introduced, and dockside work opportunities for ILA members declined still further. These developments led ILA to negotiate with NYSA, as a part of its 1969 collective bargaining agreement, the Rules on Containers (Rules). The Rules dealt specifically with the consolidation of LCL and LTL cargo. NYSA agreed that all consolidated LCL and LTL cargo lots originating from or to be shipped to a point within fifty miles of the dock would be stripped by longshoremen at dockside. Outbound cargo was to be restuffed into a container, while inbound cargo was to be left on the pier for pickup by the consignees. The Rules provided for a penalty against the employer of $250 for every such container which passed through the dockside without being stripped and stuffed. In 1970 the penalty was increased to $1000 per violation.

Shortly after the 1969 Rules became effective Intercontinental Container Transportation Corp. (ICTC), a consolidator with a business similar to that of Conex and Twin, brought an action in the Southern

District of New York seeking injunctive relief and damages from NYSA and ILA on the ground that the Rules violated the Sherman Act. At the same time ICTC filed unfair labor practice charges before the NLRB. In the antitrust action, then District Judge Mansfield granted a preliminary injunction prohibiting the defendants from refusing to handle containers stuffed or stripped by the plaintiff. On appeal from that interlocutory order the Second Circuit reversed, holding that there was little likelihood of ultimate success on the merits, because the collective bargaining agreement of which the Rules were a part probably fell within the labor exemption to the antitrust laws. *Intercontinental Container Transp. Corp. v. New York Shipping Ass'n*, 426 F.2d 884 (2d Cir. 1970) *(ICTC)*. In ICTC's unfair labor practice case, the Regional Director refused to issue a complaint on the ground that the Rules on Containers were a valid work preservation agreement, and the General Counsel denied the appeal. Joint App. 303a–305a.

The Rules on Containers were carried forward in the 1971–1974 collective bargaining agreement negotiated between ILA and the Council of North Atlantic Shipping Associations (CONASA), an employer bargaining unit composed of NYSA and employer associations in five other North Atlantic ports. But for reasons that are in dispute, the Rules were not consistently enforced. Conex and Twin were therefore able to continue in the business of consolidating LCL and LTL lots, using containers furnished by the vessel owners. Access to such containers was essential to the business of the consolidators, since the vessel owners' ships could carry only specially designed containers, and since prior to October, 1974, Sea-Land and Seatrain were two of only three container carriers operating between the Port and Puerto Rico.[1]

The failure to enforce the Rules led to attempts to improve their effectiveness. On January 25–29, 1973, representatives of CONASA, acting for the employers it represented, met with representatives of ILA in Dublin, Ireland. There those parties negotiated and executed Interpretive Bulletin No. 1, generally known as the Dublin Supplement. The Dublin Supplement established new mechanisms for the enforcement of the Rules against consolidators. It provided that off-pier consolidators operating within fifty miles of the Port were to be considered as operating in violation of the Rules. Consolidators could not avoid application of the Rules by relocating their facilities beyond the fifty mile limit, because the agreement contained a so-called "evasion" or "runaway shop" provision. The Supplement also provided for the establishment and circulation to all carriers and stevedores of a list of such violators, and vessel owners were to be fined $1000 for each container furnished to them. The Dublin Supplement was to be policed by a joint ILA–NYSA Container Committee.

In February, 1973, the vessel owners, using ILA labor, commenced stripping and restuffing outbound LCL and LTL containers which had already been stuffed by employees of Conex and Twin at their off-pier facilities and trucked to the pier for shipment to Puerto Rico. Beginning in March, 1973, the three vessel owners operating in the Puerto Rican trade refused to furnish Conex and Twin with empty containers. On April 13, 1973, NYSA and ILA issued a joint statement to NYSA members, naming fourteen consolidators, including Conex and Twin, as operating in violation of the Rules. The notice activated the provision in the Dublin Supplement requiring all NYSA members to refuse containers to the listed companies. These actions had the effect of terminating the plaintiffs' business of freight consolidation for the New York-Puerto Rico trade.

On June 1, 1973, Conex, faced with the destruction of its business, filed charges with the National Labor Relations Board (NLRB). It alleged that by agreeing to the

---

1. The third shipper, Transamerica Trailer Transport, Inc. (TTT), is not a defendant in this action.

Rules and Dublin Supplement NYSA and ILA had violated § 8(e)[2] of the Labor Management Relations Act (LMRA), and that by seeking to enforce that agreement ILA had violated § 8(b)(4)(ii)(B) of the Act.[3] Thereafter the General Counsel of the NLRB, acting pursuant to § 10(*l*), of the Act, 28 U.S.C. § 160(*l*), filed a complaint against ILA in the United States District Court for the District of New Jersey seeking preliminary injunctive relief pending final disposition of those charges by the Board. Judge Lacey conducted a hearing on the § 10(*l*) application at which an extensive record was compiled respecting the Rules, the Dublin Supplement, and their effect upon the business of Conex. In that hearing the General Counsel contended that the Conex containers had not historically been stripped and restuffed at the docks by longshoremen, and thus that the activity of which Conex complained was secondary, without a work preservation justification, and in violation of §§ 8(b)(4)(ii)(B) and 8(e). ILA made the opposite contention, and testimony was presented on the issue so drawn. The district court concluded that the General Counsel's theory was substantial and not frivolous. It therefore enjoined enforcement of the Rules against Conex, the charging party. *Balicer v. International Longshoremen's Ass'n*, 364 F.Supp. 205 (D.N.J.), aff'd, 491 F.2d 748 (3d Cir. 1973). Following a separate hearing on substantially identical charges filed with the NLRB by Twin, the General Counsel later obtained a § 10(*l*) injunction prohibiting enforcement of the Rules against it. *Balicer v. International Longshoremen's Ass'n*, 86 L.R.R.M. 2559 (D.N.J.1974).

Before the NLRB the Conex and Twin charges were consolidated for hearing. The parties stipulated that the record made before Judge Lacey in the § 10(*l*) case, as supplemented by affidavits submitted by intervenor International Brotherhood of Teamsters, Local 807, which represents Conex employees, and by additional affidavits submitted by ILA and NYSA, would constitute the record for the unfair labor practice proceedings. On the basis of that record an Administrative Law Judge found that the Rules and Dublin Supplement, and the resulting boycott of Conex and Twin, were addressed to the labor relations of the NYSA employer-members with their own employees. He therefore concluded that the boycott involved protected primary activity. The NLRB disagreed. The Board rejected the argument that the agreement was a valid effort by ILA to preserve for its members work which they had historically performed. In the Board's eyes, the "work in controversy" was the stuffing and stripping work performed by LCL and LTL consolidators at their off-pier facilities, not loading and unloading of ships at dockside by longshoremen. Thus the Rules could not be justified as a work preservation agreement, valid under the Supreme Court's interpretation of § 8(e) in *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Moreover, even if ILA once had a valid claim to the work of stuffing and stripping containers, the Board concluded, that claim had been abandoned in the 1959 ILA–NYSA agreement authorizing the use of container vessels. It therefore held the agreement embodied in the Rules and Dublin Supplement to be a violation of § 8(e) because its object was to force NYSA members to cease doing business with the consolidators. The NLRB also held that ILA's actions in enforcing the agreement were unfair labor practices under § 8(b)(4)(ii)(B). It entered an appropriate cease and desist order on December 4, 1975. *Consolidated Express, Inc.*, 221 N.L.R.B. No. 144 (1975).

NYSA and ILA petitioned for review to the United States Court of Appeals for the Second Circuit. The NLRB cross-petitioned for enforcement. Conex, Twin and Teamsters Local 807 intervened. The Second Circuit held that the Board's conclusion that

---

**2.** 29 U.S.C. § 158(e). This section prohibits labor agreements by virtue of which an employer ceases to deal with another employer.

**3.** 29 U.S.C. § 158(b)(4)(ii)(B). This section forbids coercion the object of which is to force any employer to cease doing business with another employer.

the work in controversy was that historically performed by employees of the consolidators was supported by substantial evidence, and thus that its analysis of the § 8(b)(4) and § 8(e) issues was sound.[4] It therefore enforced the Board's order and denied the NYSA and ILA petitions for review. *International Longshoremen's Ass'n v. NLRB*, 537 F.2d 706 (2d Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753, *reh. denied*, 430 U.S. 911, 97 S.Ct. 1187, 51 L.Ed.2d 589 (1977). A petition for reconsideration and recall of mandate was denied by the Second Circuit on December 16, 1977. A subsequent petition to the NLRB to reopen the unfair labor practice hearing was denied on August 12, 1978.

## II. PROCEEDINGS IN THE DISTRICT COURT

Conex and Twin filed substantially identical complaints in the district court, and on April 22, 1977 the two actions were consolidated. In Count I the plaintiffs alleged that the defendants' enforcement of the Rules on Containers and Dublin Supplement constituted a group boycott of the plaintiffs that is *per se* illegal under §§ 1 and 3 of the Sherman Act. 15 U.S.C. §§ 1, 3. They sought treble damages pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, for injury to their business or property resulting from that boycott. In Count III plaintiffs alleged that ILA committed unfair labor practices in violation of § 8(b)(4)(ii)(B) of the LMRA, that those violations injured plaintiffs in their business or property, and that ILA was liable for such damages under § 303(b) of the LMRA, 29 U.S.C. § 187(b).[5] A jury trial was demanded. Thereafter Conex and Twin moved for partial summary judgment as to liability on Counts I and

III. They contended that the decision of the NLRB, enforced by the Second Circuit, established all facts material to liability issues, and that the defendants were collaterally estopped from attempting to relitigate those issues. Thus, they urged, only the amount of damages remained for trial.

In response to that motion the defendants contended that the judgment in the Second Circuit should have no issue-preclusion effect; that the activities complained of were within the protection of the non-statutory labor exemption to the antitrust laws; that if non-exempt, those activities should be tested by the rule of reason; that there were material issues of fact as to certain defenses; and that the § 303(b) claim was time barred.

The district court, although it accepted the Conex-Twin contentions in several respects, nevertheless denied partial summary judgment on both counts. Recognizing, however, that the order involved controlling questions of law as to which there is a substantial ground for difference of opinion, and that if those questions were decided in plaintiffs' favor partial summary judgment on one or both of the counts in issue might have been proper, the court on February 22, 1978 amended the opinion to include the formal statement required by 28 U.S.C. § 1292(b). The plaintiffs filed a timely notice of appeal, and this court permitted it.

## III. SCOPE OF REVIEW

◼ The parties disagree as to what legal issues may be considered on this appeal. Both sides agree that the four questions of law certified by the district court are properly before us.[6]

---

**4.** The court announced that it was "not similarly impressed" with the Board's other arguments in support of its position. 537 F.2d at 712.

**5.** That section provides:

Whoever shall be injured in his business or property by reason of any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of [section 301]

hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

**6.** These are:

1. Where plaintiff's business is conducted unlawfully, that is, where it operates as a freight forwarder having been refused a license by the Interstate Commerce Commission to so operate, has it suffered injury "in

In supporting their motion to strike portions of the appellees' briefs, appellants suggest that since the defendants prevailed in the district court on the motion for summary judgment they may not raise issues of law decided adversely to them, or not decided at all. Absent a cross-appeal, which is unavailable to a prevailing party, they contend that these issues are not properly before this court. The appellees in turn argue that because the district court refused to identify as controlling questions several equitable defenses, those defenses may not be considered in a § 1292(b) appeal. Neither view is correct. In *Katz v. Carte Blanche Corp.,* 496 F.2d 747 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974), the court stated the rule governing § 1292(b) interlocutory appeals:

> [O]nce leave to appeal has been granted the court of appeals is not restricted to a decision of the question of law which in the district judge's view was controlling.

496 F.2d at 754. *Accord, Link v. Mercedes-Benz of North America, Inc.,* 550 F.2d 860, 865 n. 2 (3d Cir.) (Seitz, C. J., concurring), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Johnson v. Alldredge,* 488 F.2d 820 (3d Cir. 1973), *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974). This rule accords with fundamental principles of appellate review. An appeal pursuant to § 1292(b), like any other, is taken from the order of the district court, not from its opinion, and the court is "called upon not to answer the question certified but to decide an appeal." *Johnson v. Alldredge, supra,* 488 F.2d at 823. When an order or judgment is before a reviewing court, "[t]he prevailing party may . . . assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even con-

sidered by the trial court." *Dandridge v. Williams,* 397 U.S. 471, 475 n.6, 90 S.Ct. 1153, 1156 n.6, 25 L.Ed.2d 491 (1970); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 381 n.4, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *see* Note, *Federal Jurisdiction and Procedure— Review of Errors at the Instance of a Non-Appealing Party,* 51 Harv.L.Rev. 1058, 1059–60 (1938).

In this case each argument advanced by the appellees would, if accepted, support the refusal to enter summary judgment of liability in favor of Conex and Twin on one or both counts. If, on the other hand, there are no genuine issues of material fact remaining to be tried, and the district court committed the legal errors of which appellants complain, we may correct those errors, and direct the entry of such a judgment. We could, of course, decline to consider all of the legal issues tendered once we found one which would sustain the denial of summary judgment. But considerations of judicial economy suggest that when a § 1292(b) appeal is taken from the denial of summary judgment an appellate court should ordinarily consider all issues "properly put in dispute" bearing upon whether entry of judgment was appropriate. *Johnson v. Alldredge, supra,* 488 F.2d at 823. Thus the several motions to strike portions of the parties' briefs will be denied, and we will consider all grounds advanced in support of the grant of summary judgment and all grounds suggested for sustaining its denial.

## IV. THE § 303 CLAIMS AGAINST ILA

Under § 303(a) of the National Labor Relations Act, 29 U.S.C. § 187(a), it is unlawful for a labor organization to engage in any activity or conduct defined as an unfair

---

its business" which is compensable in an action under Section 303 of the Labor Management Relations Act?

2. Does the NLRB's finding of an unfair labor practice foreclose consideration of the labor exemptions, statutory or implied, to the antitrust laws?

3. Must the legality of the Rules on Containers be tested against a *per se* rule of antitrust violation?

4. Where plaintiff's business is conducted unlawfully, that is, where it operates as a freight forwarder having been refused a license by the Interstate Commerce Commission to so operate, has it suffered injury to its business which is compensable under the Clayton Act?

labor practice in § 8(b)(4) of the Act. Persons injured in their business or property by such a violation may bring suit for money damages against the labor organization which committed it.[7] Conex and Twin pointed out that the NLRB found that ILA had committed § 8(b)(4) unfair labor practices, and that the Second Circuit affirmed that finding. That determination, they suggest, is binding here, leaving nothing to be litigated except the determination of damages. The appellees resist this suggestion for reasons we now address.

### A. Collateral Estoppel

■ The district court held that the NLRB's finding that the ILA had committed a § 8(b)(4) violation, made in a proceeding to which both ILA and the plaintiffs were parties, collaterally estops it from litigating its liability for damages on the § 303(b) count. ILA contends this holding was error.

First, ILA urges that the finding by the NLRB, an administrative agency, that the boycott complained of was illegal, is not entitled to res judicata effect. The cases relied upon in support of this contention[8] were, however, decided before the Supreme Court's decision in *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966), which stated that:

When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.

Since *Utah Construction* courts in several circuits have held that prior NLRB unfair labor practice determinations were controlling on the issue of liability, as to both facts

and law, in a subsequent § 303(b) damage action. *E. g., International Wire v. Local 38, IBEW*, 475 F.2d 1078 (6th Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973) (res judicata against charging party); *Texaco, Inc. v. Operative Plasterers & Cement Masons*, 472 F.2d 594 (5th Cir.), *cert. denied*, 414 U.S. 1091, 94 S.Ct. 721, 38 L.Ed.2d 548 (1973) (res judicata against charged party); *Painters District Council 38 v. Edgewood Contracting Co.*, 416 F.2d 1081 (5th Cir. 1969); *Eazor Express, Inc. v. General Teamsters Local 326*, 388 F.Supp. 1264, 1266–67 (D.Del.1975). These holdings are undoubtedly sound. The NLRB has been designated by Congress as the tribunal of choice for the adjudication of unfair labor practices, and the doctrine of primary jurisdiction is a judicial recognition of the importance of that designation. *See, e.g., Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 684–85, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). Board decisions are subject to judicial review on all issues of law. Factual issues are reviewed by a substantial evidence standard, one at least as rigorous as that applied in reviewing non-jury judicial determinations, Fed.R.Civ.P. 52(a), and a good deal more rigorous than is applied to jury verdicts. When an NLRB decision subject to such judicial review has become final it is not readily apparent that it should have any less issue preclusion effect than would judgments resulting from non-jury or jury trials.

ILA next argues that even assuming applicability of collateral estoppel to issues of fact, the issues in this case are primarily legal, and on legal issues less deference to a prior decision is appropriate. The § 303(b) cases referred to above, giving res judicata effect to NLRB unfair labor practice judgments, recognize no such distinction. Moreover, both the Supreme Court and this cir-

---

7. See note 3 *supra.*

8. *See, e.g., Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Union*, 359 F.2d 598, 602–03 n. 7 (2d Cir.), *cert. denied*, 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966); *United Brick & Clay Workers of America v. Deena Artware, Inc.*, 198 F.2d 637 (6th Cir. 1952), *cert. denied*, 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 644 (1953).

In *Riverton Coal Co. v. UMW*, 453 F.2d 1035, 1042 (6th Cir.), *cert. denied*, 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972), the legal issues sought to be foreclosed on the basis of a prior agency decision had not been decided in prior NLRB proceedings involving the same parties. Hence that case is inapposite here.

cuit have rejected that approach. In *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 601–02, 68 S.Ct. 715, 92 L.Ed. 898 (1948), the Court made clear that issue preclusion applies both as to issues of fact and as to issues of law, so long as the same transactions and legal principles are involved and there has been no subsequent change in the governing law. *See Vanderveer v. Erie Malleable Iron Co.*, 238 F.2d 510, 514–15 (3d Cir. 1956), *cert. denied*, 353 U.S. 937, 77 S.Ct. 815, 1 L.Ed.2d 760 (1957). In *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 844–45 & n.10 (3d Cir. 1974), which concerned the collateral estoppel effect of a prior judicial determination that a collective bargaining agreement fell within the labor exemption to the antitrust laws, we expressly recognized that a prior determination of a mixed question of fact and law precluded relitigation of that issue, provided that the party to be estopped had "a full and fair opportunity" to present his claim in the prior litigation. *Id.* at 844.[9]

■ It is a settled principle of administrative law that the courts give considerable deference to the construction of statutes by those agencies charged with the primary responsibility for their enforcement. ¯*E.g., Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Thus it is arguable that the scope of judicial review of agency decisions on questions of law is narrower than would be appellate review of court decisions on legal issues. But that difference does not suggest that res judicata on legal issues should be less applicable to agency judgments, for the rule of deference to agency interpretations of governing statutes is binding not only on a court reviewing an agency decision, but also on a court deciding a legal

issue in the first instance. *E.g., Zemel v. Rusk*, 381 U.S. 1, 11–12, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). Moreover, in this case the decision of the NLRB was taken to the Court of Appeals for the Second Circuit which passed upon the legal issues involved.

Finally, ILA suggests that for two reasons it did not receive a "full and fair opportunity" to litigate before the NLRB. First, it contends that the Board's procedures provided inadequate opportunity for discovery against Conex and Twin. Had ILA been able to avail itself of the discovery provisions of the Federal Rules of Civil Procedure, it argues, it might have been able to establish that Conex and Twin had developed their "tradition" of off-pier consolidation by fraudulent avoidance of the 1969 Rules on Containers, and had such evidence been available it might well have led to a different result before the Board.

[4] As a general rule, recognition of a judgment in a prior action between the same parties should be denied only upon a compelling showing of unfairness. *See* Restatement (Second) of Judgments (Tentative Draft No. 1, 1973) § 68.1 and Comment f. This is particularly true where, as here, the parties litigant were represented by expert lawyers who had every reason to expect that a defeat in the first action might lead to a second suit founded on the judgment. The Supreme Court has suggested, however, that in an appropriate case a district court may deny collateral estoppel effect on the ground of unfairness, even to a judgment in a prior action between the same parties, if there are "procedural opportunities available to the [defendant] that were unavailable in the first action of a kind that might be likely to cause a different result." *Parklane Hosiery Co. v. Shore*,

**9.** ILA also argues against recognition of the judgment in the unfair labor practice case in that the NLRB's proceedings are directed toward vindication of "public" rights, while those asserted in the § 303(b) count are only private. It is true that the charging party in an unfair labor practice proceeding before the Board advances the public interest in a fair and orderly labor marketplace. But the typical charging party acts primarily in his own interest to halt conduct that is injuring him personally. Equal-

ly when resorting to a § 303(b) remedy the plaintiff, while acting primarily in his own interest, vindicates the public policy of the National Labor Relations Act prohibiting unfair labor practices. That public policy, as interpreted by the NLRB, should in the § 303(b) case determine whether or not there has been a violation. We are therefore unpersuaded that the differing object of proceedings before the NLRB should serve as a ground for reducing their collateral estoppel effect.

439 U.S. 322, 331, 99 S.Ct. 645, 652 & n. 15, 58 L.Ed.2d 552 (1979). The court included discovery among the procedural devices the unavailability of which in the first action may militate against application of estoppel by judgment. *Id.* at n.15. On the record considered by the district court, however, ILA has made no showing of unfairness. It stipulated before the NLRB that the record in *Balicer v. ILA,* 364 F.Supp. 205 (D.N.J.), *aff'd,* 491 F.2d 748 (3d Cir. 1973), together with the supplemental affidavits submitted, sufficed for the decision of the unfair labor practice charges. When it made that stipulation ILA knew that Mr. Jacobs, a principal witness for the charging parties in *Balicer,* had previously testified before the Federal Maritime Commission regarding a pattern of payoffs on the docks which facilitated evasion of the 1969 Rules. Thus the parties before the Board were undoubtedly on notice of the likely existence of the same evidence they seek to introduce in this proceeding. Nevertheless, ILA stipulated to a more limited record, bypassing the opportunity to resort to the not insubstantial provisions for production and examination of witnesses and documents available in NLRB cases. *See* 29 C.F.R. §§ 102.30, 102.31 (1977). Instead of probing the transactions described in the Jacobs testimony, ILA stipulated that "there [were] no material issues of credibility in the record before the [Board] for resolution requiring a formal hearing," and assured the ALJ that the unfair labor practice charges "[could] be fully resolved on the basis of the exhibits and transcripts of testimony entered in the [*Balicer* case]." Joint App. 209–10. Thus whatever the faults of the discovery procedures available before the Board, ILA's failure to discover additional evidence was not the conse-

quence of those procedures, but of its own decision not to seek or present further evidence in the NLRB proceeding. It cannot rely on procedural inadequacies in the NLRB case which in no way affected its outcome.

ILA relies on *Hudson River Fisher-men's Ass'n v. FPC,* 498 F.2d 827 (2d Cir. 1974), for the proposition that collateral estoppel should not be applied where relevant evidence has come to light that could not have been discovered in the prior proceeding by the exercise of due diligence. That case involved an application to reopen a licensing proceeding before the Federal Power Commission in order to correct an error in a technical report which had been relied upon in that proceeding, which error could not have been discovered by the exercise of due diligence. The Second Circuit, reviewing the FPC's refusal to reopen the hearing, construed Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), as permitting reopening, and remanded for a hearing. *Id.* at 833–34. Assuming that a principle similar to that announced in the *Hudson River* case also applies in NLRB proceedings, this is not the proper forum for its application. For as that case suggests, if ILA has found new evidence, its appropriate remedy is to seek to reopen the unfair labor practice case either before the NLRB or the Second Circuit. We note that such attempts have been made and rejected.[10]

Second, ILA argues that collateral estoppel is unfair because the Board's resolution of the unfair labor practice issue represented an abrupt and unanticipated change in the applicable legal doctrine. Prior to 1975, they argue, there were indications that the Rules on Containers were

---

10. These rejections also may indicate that evidence of the manner in which Conex and Twin acquired the stuffing and stripping work would not have had any impact on the NLRB decision. It was the General Counsel's position in the § 10(*l*) case before Judge Lacey, and that of the charging parties before the Board, that regardless of how the latter acquired the work the Rules on Containers were an illegal work reacquisition agreement. The Board appears sub-

sequently to have adopted that position. *See International Longshoremen's Ass'n (Dolphin Forwarding, Inc.),* 236 N.L.R.B. No. 42, 98 L.R. M.M. 1276, 1277 n.3 (1978). Because we hold that there was an adequate opportunity to litigate the work acquisition contention, however, it is not necessary to rest our holding on the probable irrelevancy of the tendered evidence to the unfair labor practice determination.

legal under both the antitrust laws and the Labor Act.[11] ILA cites no authority for the proposition that collateral estoppel effect may be denied to a judgment because it reflects a change in the prior applicable law, and in the § 303 context such a rule appears unwarranted. A primary purpose of the § 303(b) remedy is to make the plaintiff whole for injury done to his business in violation of federal labor law. *Teamsters Local 20 v. Morton*, 377 U.S. 252, 260, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). To allow the union a defense of belief in legality in § 303 cases would cast the burden of such losses upon innocent parties in direct contravention of that policy. While the unforeseeability of an unfair labor practice judgment may reduce the deterrent value of the § 303 sanction, Congress's essential compensatory purpose remains, and should not be thwarted. Even if such a rule were recognized it might not help ILA here, for the prior actions upon which it claims to have relied never resulted in a final determination that the Rules on Containers were legal. Moreover, both the ICTC cases were decided prior to the adoption and enforcement of the Dublin Supplement, a development which might well have changed the earlier tribunals' views of the problem. The claim of an unanticipated change in the law does not persuade us that the judgment in the NLRB case should not bind ILA.

### B. The Statute of Limitations

ILA pleads that the § 303(b) claim is time-barred by the one year Puerto Rico statute of limitations, P.R. Laws Ann. tit. 31, § 5298(2), because Conex and Twin are incorporated in that Commonwealth and each conducts one end of its freight consolidator business there. The district court rejected that contention, holding that the consolidators' § 303(b) claim was governed by New Jersey's six year statute of limitations for actions in contract, N.J.Stat.Ann. § 2A:24–1 (West Supp. 1978), and thus was

not time-barred. No federal statute imposes an express limitation upon actions brought under § 303(b) of the Labor Management Relations Act. The parties agree that in such a vacuum a federal court will apply the law of the state in which it sits. *See, e.g., United Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Cope v. Anderson*, 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947). At this point they part company.

ILA argues that a federal court sitting in New Jersey on a § 303(b) case would look not to the most closely analogous New Jersey statute of limitations, but rather to New Jersey's choice of law rules. Under those rules, it suggests, New Jersey would apply not its own six year statute of limitations, but that of Puerto Rico. In advancing this argument ILA relies on the Rules of Decision Act, 28 U.S.C. § 1652, as interpreted in *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). That statute and those authorities, however, deal with the law governing causes of action arising under state law. When, as in § 303(b) cases, the cause of action arises under federal law, they have no applicability. Which state statute is to be borrowed and how it is to be applied to a cause of action based on federal law are federal law questions, and are determined by federal statutory policy. *Holmberg v. Armbrecht*, 327 U.S. 392, 395, 66 S.Ct. 582, 90 L.Ed. 743 (1946). Thus state choice of law rules can govern the choice of a statute of limitations for a § 303(b) claim only if reference to those rules furthers substantive federal policy. *Moviecolor, Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 83–84 (2d Cir.), *cert. denied*, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961).

This principle has been recognized in § 303(b) cases. In *United Mine Workers v. Railing*, 401 U.S. 486, 91 S.Ct. 991, 28

---

11. In *International Longshoremen's Ass'n, Local 1248 (U.S. Naval Supply Center)*, 195 N.L.R.B. 273 (1972), an attempt to enforce the Rules against an off-pier consolidator was held

to be an unlawful secondary boycott. Thus a full year before the enforcement of the Dublin Supplement began the NLRB had questioned its legality.

L.Ed.2d 272 (1970), a case presenting, as does this, both a § 303(b) claim and an antitrust claim against a labor organization, the Court remanded to the Fourth Circuit so that it could consider whether the state statute of limitations applicable to the § 303(b) claim should be construed to apply, with respect to accrual of the cause of action, in the same manner as 15 U.S.C. § 15b had been construed in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1970), as applying to an antitrust claim. On remand Judge Craven recognized that both § 303(b) and § 4 of the Clayton Act provided for recovery for injury to business or property, and concluded that the state statute of limitations governing the § 303(b) claim should be interpreted in the same manner as 15 U.S.C. § 15b. Indeed he went further, suggesting to the district court that on remand it should consider whether to read into the state statute a tolling provision similar to 15 U.S.C. § 16(b) (which tolls § 15b for private antitrust actions during the pendency of government enforcement actions), to toll the time bar against the § 303(b) count during the pendency of unfair labor practice proceedings before the NLRB. *Railing v. United Mine Workers*, 445 F.2d 353 (4th Cir. 1971); cf. *Kreshtool v. International Longshoremen's Ass'n*, 242 F.Supp. 551, 554 (D.Del.1965). See also *Kinty v. United Mine Workers*, 544 F.2d 706, 723 (4th Cir. 1976), cert. denied, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977); *Metropolitan Paving Co. v. International Union of Operating Eng'rs*, 439 F.2d 300, 306 (10th Cir.), cert. denied, 404 U.S. 829, 92 S.Ct. 68, 30 L.Ed.2d 58 (1971). These cases are authority for the rule that in a § 303(b) case the specific state statute of limitations that is adopted, and the manner of its adoption, are to be determined by the policies that underlie the federal regulatory statute.

ILA argues that *Cope v. Anderson*, 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1966), indicates that state choice of law rules ought invariably to determine the limitations period for federal causes of action. In *Cope*, an action brought under the National Bank Act, 12 U.S.C. §§ 63, 64, the Court applied the forum state's "borrowing statute" to determine the limitations period under the Act. The explanation for this holding is obscure, and it is far from certain that the *Cope* rationale was intended to extend either to judge-made choice of law rules or to actions under § 303(b). Furthermore, in a more recent decision, *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966), the Court expressly reserved the issue whether state choice of law rules should be applied in determining the applicable statute of limitations under § 303(b). *Id.* at 705 n.8, 86 S.Ct. 1107. *Cope* cannot, therefore, be regarded as foreclosing that question, which is squarely before us.

We resolve it in favor of a federal rule. The choice of law rule to be applied to a § 303(b) cause of action must meet two criteria. It must produce results consistent with national labor policy, and it should, insofar as is possible, be relatively easy to administer. On both counts, we think, application of a federal choice of law rule to determine the governing time bar is preferable. Federal labor policy may be thwarted by state limitations periods unduly short or discriminatory. Cf. *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 707 n.9 (1966) 86 S.Ct. 1107. State choice of law rules, geared as they are to geographical factors or state policy interests, may be insensitive to this federal concern. From the viewpoint of ease of administration, state choice of law rules have an initial advantage. Already formulated, they are readily at hand. But their frequently complex calculus of contacts and interests may produce considerable difficulty in application and uncertainty of outcome without any corresponding improvement of result. A federal rule, in contrast, recognizing the more limited range of factors relevant under federal law, can be simplified.

While neither party has briefed the issue of the appropriate federal choice of law rule for § 303(b) cases, we conclude upon careful reflection that as a general rule the governing statute of limitations should be that of the state in which the

federal court sits, unless a party can make a compelling showing that the application of that statutory time bar would seriously frustrate federal labor policy or work severe hardship to the litigants. *Cf. UAW v. Hoosier Cardinal Corp.,* 383 U.S. at 706, 86 S.Ct. 1107. *See* Hill, *State Procedural Law in Federal Nondiversity Litigation,* 69 Harv.L.Rev. 66, 102–03 & n.64 (1955). Reference to the forum state's statute of limitations absent some such showing provides an efficient and readily administrable rule for the vast majority of § 303(b) cases, while leaving leeway for the relatively rare instances in which the application of the forum state's statute would seriously distort the operation of the § 303 remedy. How serious that distortion must be to displace the forum state's statute of limitations we need not resolve in this case. Here the district court applied that limitations period. Neither party suggests that its application endangers federal labor policy or creates any risk of unfairness to the litigants. Absent such danger or risk the district court's application of the New Jersey statute must be affirmed.[12]

### C. Illegality

 ILA argues that even if it is collaterally estopped to contest the § 8(b)(4) violation, and even though the damage action was timely filed, its contention that Conex and Twin were operating at the time of the unfair labor practices without freight forwarder permits issued by the Interstate Commerce Commission (ICC), would, if such licenses were required, be a complete defense to the § 303(b) claim.[13] Conex and Twin have always asserted that they are not freight forwarders within the meaning of Part IV of the Interstate Commerce Act, 49 U.S.C. § 1002(a)(5)(A), and that the oper-

ating authority granted them by the Federal Maritime Commission (FMC) sufficed. The district court, without determining whether or not ICC licenses were required, concluded that if ILA could establish that they were, a judgment in favor of Conex and Twin on the § 303(b) claim would be precluded.

The district court recognized that in an unfair labor practice proceeding before the Board the charging party's violation of an unrelated statute is not a defense to a charge of unlawful secondary boycott activity. *See, e.g., NLRB v. Springfield Building & Construction Trades Council,* 262 F.2d 494 (1st Cir. 1958). But unlike an action before the Board, a damage action for injury to "business or property" under § 303(b), the district court held, was "purely compensatory," designed to return to plaintiffs only those losses to which they were legally entitled. If the plaintiffs' businesses were conducted without the required ICC permit, the court reasoned, they were "nonexistent in the eyes of the law, [and] entitled to no legal protection." 452 F.Supp. at 1034.

This argument has a simplistic surface appeal reminiscent of the long discredited doctrine that a person driving without a license is a trespasser on the highway who may not recover for injury negligently inflicted upon him. *See, e. g., Potter v. Gilmore,* 282 Mass. 49, 184 N.E. 373 (1933); Annotation, 87 A.L.R. 1462. Like that doctrine the argument suffers from serious flaws. First, despite the fact that only compensatory damages may be recovered under § 303(b), *e.g., Teamsters Local 20 v. Morton,* 377 U.S. 252, 260, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), such actions, like the remedies available before the NLRB, serve an important deterrent purpose as well. Discussing the draft legislation that became

---

**12.** Because we hold that the choice of a governing limitations period, borrowed or otherwise, does not depend on New Jersey choice of law rules we need not decide whether, had we concluded New Jersey choice of law rules applied, the result would be different. We note, however, that since New Jersey Teamsters were employed by Conex and Twin in that state, and were deprived of employment there by the unfair labor practices complained of, it seems

likely that New Jersey would apply its own statute of limitations. *See Schum v. Bailey,* 578 F.2d 493 (3d Cir. 1978); *Allen v. Volkswagen of America, Inc.,* 555 F.2d 361, 364 (3d Cir. 1977) (Seitz, C.J., concurring).

**13.** A similar illegality defense is raised with respect to the § 4 Clayton Act claim as well, and is discussed, *infra,* Part V. C.

§ 303(b), Senator Taft, its sponsor, observed:

> . . . I think the threat of a·suit for damages is a tremendous deterrent to the institution of secondary boycotts and jurisdictional strikes.

93 Cong.Rec. 5060; II Leg. Hist. of Labor Management Relations Act of 1947 at 1371, *cited in Twin Excavating Co. v. Garage Attendants Local 731*, 337 F.2d 437, 438 (7th Cir. 1964). Indeed, a secondary boycott is in the nature of a tort, and it is settled doctrine that almost all causes of action sounding in tort have deterrent as well as compensatory rationales. *E.g.*, G. Calabresi, The Costs of Accidents (1970). Thus the effect of the proposed illegality defense is to sacrifice a recognized purpose of § 303(b), the deterrence of secondary boycotts in violation of federal labor policy, in the interest of encouraging compliance with an entirely unrelated federal policy of ICC licensing. The regulatory scheme enforced by the ICC has goals substantially unrelated to the federal policy against secondary boycotts, and its own independent set of statutory sanctions. *See* 49 U.S.C. § 1021. Absent contrary evidence, we assume that Congress felt these sufficient for the enforcement of the ICC regulatory scheme. The creation by judicial fiat of an additional sanction—the withdrawal of the protection of § 303(b) because of a technical violation of an ICC licensing requirement—must be viewed, as was the "trespasser on the highway" doctrine, as enforcing a punishment disproportionate to the crime. In short, the proposed defense would disrupt the balance struck by Congress between permissible and impermissible labor activities, with no discernible benefit, and perhaps some loss, to the ICC regulatory scheme.

Thus we hold that the district court erred in concluding that the absence of an ICC license would be a defense to liability under § 303(b) for the unfair labor practices found by the NLRB. We express no view on the question whether, in the trial on damages, evidence of the absence of such a license would bear upon the extent of injury to the business or property of Conex and Twin.

That, we think, would depend upon the proof of such injury, and the relationship of that proof to the ability of Conex and Twin to carry on their business without a Part IV permit.

## D. Equitable Defenses

ILA's equitable defenses tendered in opposition to summary judgment on liability were summarized by the district court as follows:

> ILA also argues estoppel *en pais*, laches, and equitable estoppel. These equitable theories are invoked based on ILA's claims that Conex intentionally avoided challenging the Rules on Containers when they were first implemented because, in fact, Conex thrived on their existence: watching the enforcement of the Rules drive its competitors out of business while developing techniques, including bribery of dock bosses and alteration of shipping documents, to evade the Rules' strictures.

452 F.Supp. at 1036. Without extended analysis the court ruled that a fuller development of the record was needed before it could rule on the sufficiency of the tendered defenses. Conex and Twin contend that this was error because the affidavits filed in support of the defenses were legally insufficient.

We start with the observation that the plaintiffs do not seek damages for any injury to their business or property occurring prior to the adoption of the Dublin Supplement in January, 1973. It was not until February, 1973, that the defendants commenced stripping and restuffing plaintiffs' containers. It was not until March, 1973, that plaintiffs were refused containers by the vessel owners. It was not until April, 1973, that they were blacklisted. In June, 1973, Conex filed an unfair labor practice charge with the NLRB. The record contains nothing suggesting that after January, 1973, Conex or Twin took or failed to take any action which could be the predicate for a defense of laches or of estoppel. Indeed ILA does not so argue. Thus we can eliminate from consideration any possi-

bility that a § 303(b) cause of action which accrued in January, 1973, was barred by laches. *Cf. Falsetti v. Local 2026, UMW,* 355 F.2d 658, 662 (3d Cir. 1966).

■ On appeal the ILA concentrates its equitable defense arguments on the period prior to the adoption of the Dublin Supplement. It points to two factors which it suggests are equitable bars to recovery for the post-Dublin Supplement injuries. First, Conex and Twin failed to file unfair labor practice charges between 1969, when the Rules were adopted, and 1973, when they were supplemented and finally enforced. Second, prior to 1973, while the Rules were in effect, Conex and Twin managed to evade their enforcement. This conduct, ILA contends, gives rise to an estoppel *en pais*. It reasons that the plaintiffs knew they were targets of the Rules as early as July, 1969, and that they took steps, including forgery, bribery, and diversion of cargo to other ports, to make it appear they were in compliance. At the same time, the plaintiffs failed to bring an action before the Board to challenge the Rules on Containers. "Since appellees have always obeyed both the 10(*l*) injunction and the Board's cease-and-desist order, such timely challenge would have prevented any further violations of the Act and put an end to Appellant's [sic] damages while they were minimal." (ILA Brief at 33–34). The effect of these evasionary and dilatory tactics, ILA contends, was to persuade it (a) that the Rules were being enforced and (b) that they were not harmful. In reliance on those appearances, it proceeded to force the adoption of the Dublin Supplement. Since the plaintiffs' wrongful conduct induced the adoption of the Dublin Supplement, ILA contends, they cannot now claim compensation for injury resulting from its enforcement.

The defendants have not cited, and we have not found, any case in which the defense of equitable estoppel or estoppel *en pais* has been recognized in an action brought pursuant to § 303(b) of the Act. We need not decide whether such a defense should be recognized, however, because it is clear that even on the defendants' theory of estoppel *en pais*, the affidavits supporting the defense were insufficient to sustain it. In the case upon which ILA principally relies, the four elements of estoppel *en pais* are defined:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct must be acted upon or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*United States v. Georgia Pacific Co.,* 421 F.2d 92, 96 (9th Cir. 1970) (quoting *Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 104 (9th Cir.), *cert. denied,* 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960)). The relevant facts about the impact of the Rules apparently were known to the plaintiffs, and thus the first element of an estoppel exists. But there are no facts in the record to support any of the other three elements of the defense. ILA has cited no evidence for its implausible assertion that the consolidators' evasion of the Rules or failure to file an unfair labor practice charge was intended, or could reasonably have been believed to be intended, to induce it to bargain for the Dublin Supplement. The pleadings and affidavits indicate that the plaintiffs hoped that ILA would not respond at all, so that their evasion of the Rules could continue. Nor is the failure of Conex and Twin to bring an NLRB case prior to 1973 a fact which ILA had a "right to believe" was intended to induce the adoption of the Supplement. A rule that persons who failed to charge a continuing unfair labor practice at the first opportunity could for that reason later be barred from recovery, even when as in this case the severity of the practices drastically increased, would have dangerous consequences for national labor policy. Proceedings before the NLRB by a charging party involve substantial expense and often substantial risk of retaliation. Firms not yet seriously injured should not be compelled to risk a confrontation at the earliest possible moment for fear that if they do not they

will thereafter be stripped of the protection of § 303(b).

ILA has also failed to suggest any facts indicating that it was in fact ignorant of the true state of affairs on the docks, or that it relied on an inaccurate version of events in adopting the Dublin Supplement. To the contrary, all of the evidence in the record suggests that ILA was very much aware that the Rules on Containers were *not* enforced.[14] Indeed, several sections of the Dublin Supplement are directed in so many words to the "evasion" or circumvention of the Rules on Containers. *See* Interpretive Bulletin No. 1, Interpretations 1.3–3, 1.6, 1.7, 1.8. ILA nowhere cites any information meeting the standards of Fed. R.Civ.P. 56(c) suggesting that it ever held, or acted upon, anything other than an accurate view of events.

Since there is no material issue of fact with respect to three of the four elements of an estoppel, we conclude that the equitable defense asserted by ILA would be legally insufficient to preclude the imposition of liability under § 303(b) and that the district court erred in denying summary judgment in order to explore it further. We hold, then, that the order appealed from, insofar as it denied a summary judgment of liability on Count III of the Conex and Twin complaints must be reversed.

### V. THE § 4 CLAYTON ACT CLAIM

In Count I of their complaints Conex and Twin charge that the Dublin Supplement and the steps taken to implement it are a concerted refusal to deal, and thus a *per se* violation of the Sherman Act. While Count III seeks relief only against ILA, Count I joins both union and employer defendants, all of whom, admitting both the agreement and the steps taken to implement it, assert several defenses to the antitrust claim, which we now consider.

#### A. The Labor Exemption

The principal defense tendered in opposition to summary judgment is that both the Rules and the Dublin Supplement are collective bargaining arrangements falling within the labor exemption to the antitrust laws. The defendants concede that both agreements involved concerted action between the ILA and the employer defendants, and hence are ineligible for the statutory antitrust exemptions provided in the Clayton Act, 15 U.S.C. § 17, 29 U.S.C. § 52, and the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105, 113. *UMW v. Pennington*, 381 U.S. 657, 661–62, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *United States v. Hutcheson*, 312 U.S. 219, 232, 61 S.Ct. 463, 85 L.Ed. 788 (1941).

Thus the dispute is over the applicability of the so-called nonstatutory labor exemption, defined by the Supreme Court in the series of cases beginning with *Apex Hosiery v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), and culminating in *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). That dispute, in turn, presents two aspects: (1) whether the NLRB finding of violations of §§ 8(b)(4)(ii)(B) and 8(e) precludes relitigation of the illegality of the charged conduct as a matter of federal labor law; and (2) whether, assuming such illegality, the nonstatutory labor exemption should nevertheless be available.

#### 1. The Preclusive Effect of the NLRB Judgment On Labor Law Issues

In Part IV. A., *supra*, we held that ILA was estopped by the judgment in the NLRB unfair labor practice case from relitigating in the § 303(b) case the legality of the Dublin Supplement and the steps taken to implement it. To the extent that the undisputed facts and conclusions of law referred to in that Part are relevant on the availability of the labor exemption to ILA, our prior analysis is equally applicable. Moreover, NYSA, as the collective bargaining representative of the vessel owners and

---

14. *See, e.g.,* Letter of Thomas W. Gleason [President of the ILA] to James Dickman [President of NYSA] May 11, 1972. Joint App. 321a.

stevedores, was a party to the NLRB action, an appellant in the Second Circuit and an unsuccessful petitioner for certiorari in the Supreme Court. None of these defendants contend that they were so insufficiently represented before the Board that they should not be bound to the same extent as ILA by the resulting judgment.[15] Since both ILA and the employer defendants were represented before the NLRB and in the Court of Appeals in the Second Circuit, we hold that they are equally bound by the judgment, and estopped to contest the finding that their efforts to enforce the Rules were unfair labor practices. We reject, as well, appellees' contention that recognizing the issue preclusion effect of the NLRB decision deprives them of their seventh amendment right to a jury trial. *Parklane Hosiery Co. v. Shore*, 439 U.S. at 332, 99 S.Ct. at 652 & n.19.

## 2. The Effect of the § 8(e) Violation upon the Availability of the Labor Exemption

 We are faced, then, with the question whether a contract or combination, which has been adjudicated to be a violation of the prohibition in § 8(e) against contracts calling for secondary boycotts, can nevertheless be held to be within the nonstatutory antitrust exemption because it was negotiated as a part of a collective bargaining agreement.

Prior to 1959 it was an unfair labor practice under then § 8(b)(4)(A) of the National Labor Relations Act for a union to urge employees of an employer to refuse to perform work in order to compel their employer to cease doing business with a third party. That prohibition did not apply to employer refusals to deal that were embodied in collective bargaining agreements, however, and unions remained free to seek such agreements by collective bargaining, informational picketing or otherwise. *See*

*Brotherhood of Carpenters v. NLRB*, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958) (*Sand Door*). Congress concluded that these "hot cargo" agreements gave unions too much leverage against secondary parties, and in 1959 it amended § 8(b)(4), to prohibit coercion directed not only at employees of the primary employer, but also against the employer himself. It also added in § 8(e) a prohibition upon contracts obligating employers to refrain from doing business with third parties.[16] In *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), the Court narrowly construed the prohibitions in the 1959 amendments. Distinguishing *Allen Bradley Co. v. Local Union No. 3, IBEW*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), as a case involving secondary boycott activity, the Court held that while secondary activity aimed at acquiring for employers and union members work already being performed by third parties was prohibited, Congress did not intend the prohibition of work preservation clauses in collective bargaining agreements even though such clauses might fall within the literal terms of § 8(e). Indeed the Court explicitly recognized that the 1959 amendments made no change in the rule of *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), that work preservation is a mandatory subject of collective bargaining. 386 U.S. at 642, 87 S.Ct. 1250. The determination whether a given demand went beyond the legitimate primary area of work preservation and into the forbidden secondary boycott area was said to involve in each instance a factual inquiry into all the surrounding circumstances. 386 U.S. at 644, 87 S.Ct. 1250. Here the forum of choice, the NLRB, has made that factual inquiry and has determined that the Rules are directed not at work preservation, but at acquiring work from the employees of a secondary employer.

---

15. The stevedore defendants do contend that as a matter of antitrust law the record on summary judgment is legally insufficient to bind them. That contention is discussed at Part V. F., *infra*.

16. Congress at the same time recognized that the special historical situation in the construction and apparel industries justified a limited exception to § 8(e) for those two industries. Those provisions are, of course, inapplicable here.

One consequence of the NLRB's decision is to foreclose the argument that the object of the agreement ultimately reached is a mandatory subject of collective bargaining, for an agreement that violates § 8(e) cannot meet that standard. The NLRB has stated that:

the Act does not permit . . . the insistence, as a condition precedent to entering into a collective bargaining agreement, that the other party to the negotiations agree to a provision or take some action which is unlawful or inconsistent with the basic policy of the Act. Compliance with the Act's requirement of collective bargaining cannot be made dependent upon the acceptance of provisions in the agreement which, by their terms or in their effectuation, are repugnant to the Act's specific language or basic policy.

*National Maritime Union (Texaco Co.)*, 78 N.L.R.B. 971, 981–82 (1948), enf'd, 175 F.2d 686 (2d Cir. 1949), cert. denied, 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed. 589 (1950). *See also NLRB v. Wooster Div., Borg-Warner Corp.*, 356 U.S. 342, 360, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958) (Harlan, J., concurring and dissenting).

A further consequence of the NLRB's factual determination, in the antitrust context, is suggested in Justice Brennan's *National Woodwork* discussion:

In effect Congress, in enacting § 8(b)(4)(A) of the Act [the statutory predecessor of § 8(e)], returned to the regime of *Duplex Printing Press Co.* and *Bedford Cut Stone Co., supra*, and barred as a secondary boycott union activity directed against a neutral employer, including the immediate employer when in fact the activity directed against him was carried on for its effect elsewhere.

386 U.S. at 632, 87 S.Ct. at 1262. Justice Brennan's reference to *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), and *Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n*, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916 (1927), is to cases holding that despite § 20 of the Clayton Act a secondary boycott could be enjoined in a private action under the antitrust laws. The quoted dictum, although suggestive of the effect of a § 8(e) violation on the nonstatutory antitrust exemption, is not decisive. Both *Duplex Printing* and *Bedford Cut Stone* were decided on statutory exemption grounds prior to the full emergence of the nonstatutory exemption. But it must be kept in mind that §§ 8(b)(4) and 8(e), while housed in the National Labor Relations Act, are, like the Sherman Act, statutes reflecting the basic federal economic policy against restraints upon competition in the marketplace for goods and services as distinct from the labor market. Thus §§ 8(b)(4) and 8(e) reinforce rather than conflict with the basic policy of the antitrust laws, and suggest a cautious approach to the recognition of a nonstatutory antitrust exemption for conduct in violation of their prohibitions.[17] Nonetheless there remains room for the argument that even though ILA achieved at the bargaining table an object that is unlawful under §§ 8(b)(4)(ii)(B) and 8(e), and thus not a mandatory subject of collective bargaining, the nonstatutory exemption should nevertheless apply.

The term nonstatutory exemption, commonly used in discussing the interface between the often conflicting national antitrust and labor policies, is a shorthand description of an interpretation of the Sherman Act, making that statute inapplicable to restraints imposed in the interest of lawful union monopoly power in the labor market. The opinion generally credited as originating that construction of the antitrust laws is that of Chief Justice Stone in *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). In that case, an organizational dispute erupted into a sit-in strike which stopped production, and halted the shipment of finished goods. The Court

---

17. The Supreme Court has recently cautioned that all exemptions from the antitrust laws, including the labor exemption, are to be narrowly construed. *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 229, 230, 99 S.Ct. 1067, 1082, 59 L.Ed.2d 261 (1979).

held this conduct exempt from the antitrust laws on two grounds. The union's goal, "elimination of price competition based on differences in labor standards . . .," was not "the kind ·of curtailment of price competition prohibited by the Sherman Act." *Id.* at 503–04, 60 S.Ct. at 998. Moreover, Justice Stone held, there was no showing that the challenged restraint was "intended to have or in fact ha[d]" an effect upon the product market. *Id.* at 512, 60 S.Ct. at 1002. The Court thus distinguished *Duplex Printing Co.* (a classic secondary boycott) and *Bedford Cut Stone* (involving a "refusal to handle" the primary's product) because in those cases the intent and effect of the conspiracy had been to restrain the product market by pressuring secondary parties to withdraw their patronage from the target manufacturer. *Id.* at 505–06, 60 S.Ct. 982. It would seem therefore that had such a secondary purpose and effect been shown, Sherman Act liability would have attached. *See also United States v. Hutcheson,* 312 U.S. at 241–42, 61 S.Ct. 463 (Stone, C. J., concurring).

*Apex Hosiery* establishes two principles central to the subsequent development of the nonstatutory exemption. First, the rationale of the exemption is protection of the union's power to eliminate competition in the labor market over wages and working conditions. Restraints operating on that primary market are presumptively outside the scope of the Sherman Act. Second, restraints, like those in *Duplex Printing Co.* and *Bedford Cut Stone,* which are aimed at controlling a secondary product or service market are suspect, and are presumptively covered by the Sherman Act.

When the Court first had occasion to consider the application of the infant non-statutory exemption to a collective bargaining agreement, it might have taken the position that anything achieved as a result of collective bargaining with the primary employer was exempt from antitrust sanction. Such a course would have avoided many difficulties. In *Allen Bradley Co. v. Local No. 3, IBEW,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), however, the Court took a different turn, holding that

the distinction between union efforts aimed at the labor market and those aimed at the product market applied even to a collective bargaining agreement. In that case a union successfully negotiated, by legitimate means, refusal-to-deal clauses with local electrical equipment manufacturers and contractors. The union's success in obtaining those agreements created a product market cartel in the New York area, which in time came to look not only "to terms and conditions of employment but also to price and market control." *Id.* at 800, 65 S.Ct. at 1535. The union had actively assisted in policing and protecting that cartel. When an excluded electrical manufacturer sued to enjoin union activities on behalf of the cartel, the union's participation in the illegal scheme was held to be an antitrust violation despite the collective bargaining context and despite the relationship of the restraints to wage and job stability. With the *Allen Bradley* decision faded any hope for a bright line between union activities exempt from and subject to the antitrust laws based on the existence of a collective bargaining relationship. The opinion, however, strongly reaffirmed the suggestion in *Apex Hosiery* that secondary product or service market restraints ·must meet a higher ·standard of justification to claim the antitrust exemption. *Cf. National Woodwork Manufacturers Ass'n v. NLRB,* 386 U.S. at 628–30, 87 S.Ct. 1250 (characterizing *Allen Bradley* as a secondary work acquisition scheme that would now be forbidden under § 8(e)).

Justice Black's opinion in *Allen Bradley* indicates that if a union coerced a refusal-to-deal clause, or some other clause having secondary market effects, solely in its own interest, and not in the interest of conspiring businessmen, the exemption applies. *See Allen Bradley Co. v. Local No. 3, IBEW,* 325 U.S. at 809–10, 65 S.Ct. 1533. Under that reading of *Allen Bradley,* collective bargaining agreements might have been held exempt from Sherman Act scrutiny, regardless of their impact on the nonlabor marketplace, absent a showing of an intent on the part of the union to join with

employers in a larger Sherman Act conspiracy. And an appropriate test for whether the union was to be deemed to be acting solely in its own interest might well have been whether the subject matter of the agreement was a permissive or mandatory subject of collective bargaining.

In *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court considered a collective bargaining agreement with a multi-employer unit of coal producers in which the union agreed with the employers in that unit to impose the agreed-upon wage scale upon all coal producers with whom it had a collective bargaining relationship. The Union contended that since the agreement .concerned wage standards, a quintessential labor market concern, it was exempt from the antitrust laws. Six Justices rejected that contention. Justice White,. writing for three members of the Court, conceded that "wages lie at the very heart of those subjects about which employers and unions must bargain." *Id.* at 664, 85 S.Ct. at 1590. Recognizing that the union could unilaterally have adopted a uniform wage standard as a matter of bargaining policy, the Court held that the alleged agreement was not necessarily exempt. Justice White wrote:

> We think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy.

*Id.* at 665–66, 85 S.Ct. at 1591. He went on, however, to suggest that the unavailability of the exemption was not dependent upon a predatory intention on the part of the employers in the bargaining union.

> From the viewpoint of antitrust policy, moreover, all such agreements between a group of employers and a union that the union will seek specified labor standards outside the bargaining unit suffer from a more basic defect, without regard to predatory intention or effect in the par-

ticular case. For the salient characteristic of such agreements is that the union surrenders its freedom of action with respect to its bargaining policy. Prior to the agreement the union might seek uniform standards in its own self-interest but would be required to assess in each case the probable costs and gains of a strike or other collective action to that end and thus might conclude that the objective of uniform standards should temporarily give way. After the agreement the union's interest would be bound in each case to that of the favored employer group. It is just such restraints upon the freedom of economic units to act according to their own choice and discretion that run counter to antitrust policy.

*Id.* at 668, 85 S.Ct. at 1592.

Justice White's definition of the prohibited conduct is decidedly ambiguous. The first quoted excerpt seems to say that the antitrust evil is knowing union participation in an employer's conspiracy to eliminate competitors, a view consistent with some language in *Allen Bradley*. But the second passage suggests that the more serious evil, impinging upon both labor and antitrust policy, is the union's restriction of its freedom to deal with other competitor employers. That defect, Justice White suggested, remained "without regard to predatory intention or effect in the particular case." *Id.* at 668, 85 S.Ct. at 1592. This latter theme echoes the concern expressed in *Apex Hosiery* and *Allen Bradley* with agreements directed at secondary parties.

Citing Justice White's opinion, the plaintiffs argue that *Pennington* stands for the proposition that "an agreement which is tactically designed to achieve objectives outside the bargaining unit is not entitled to antitrust immunity." Plaintiffs' Brief at 38. This reads the *Pennington* holding too broadly. Although it is denominated the opinion of the Court, Justice White's *Pennington* opinion did not command a majority for his labor exemption discussion. In a concurring opinion Justice Douglas, writing for three Justices, expressly stated that as

he read Justice White's opinion, it "reaffirms the principles of *Allen Bradley* . . . ." *Id.* at 672, 85 S.Ct. at 1595. He suggested that on remand, the jury should be instructed that in order to find an antitrust violation, they must conclude *both* that the union agreed to press a wage scale that smaller employers could not pay, and that the agreement "was made for the purpose of forcing some employers out of business . . . ." *Id.* at 672–73, 85 S.Ct. at 1595. Elsewhere, he stressed that the "purpose" described earlier involves both "knowledge" that the minor manufacturers would be driven out of business, and "intent" to do so. *Id.* at 675, 85 S.Ct. at 1585. Since the three Justices who joined in the Douglas opinion would have upheld the union's claim of antitrust immunity absent a showing of predatory intent, and three others would have upheld the claim of immunity on broader grounds announced by Justice Goldberg, the Douglas opinion may well be read as limiting antitrust liability for agreements concerning subjects at the "very heart" of the collective bargaining process to cases where predatory intent can be shown. *Accord, Embry-Riddle Aeronautical Univ. v. Ross Aviation, Inc.*, 504 F.2d 896, 903 (5th Cir. 1974) ("concerted purpose"); *Lewis v. Pennington*, 400 F.2d 806, 814 (6th Cir.), *cert. denied*, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968) ("predatory intent"); Meltzer, *Labor Unions, Collective Bargaining and the Antitrust Laws*, 32 U.Chi.L.Rev. 659, 720–21 (1965); 1 P. Areeda & D. Turner, *Antitrust Law*, ¶ 229e at 211 (1977). Such a standard would tend to insulate collective bargaining over subjects like wages, which are at the core of legitimate union concern, from the disrupting effect of potential antitrust sanctions. *See Embry-Riddle Aeronautical Univ. v. Ross Aviation, Inc.*, 504 F.2d at 908; 1 P. Areeda & D. Turner, *supra*, ¶ 229e at 209–11.

If *Pennington* were the controlling precedent the plaintiffs' motion for summary judgment should properly have been denied. Assuming *arguendo* that the agreement here concerned a subject at the "very heart" of the collective bargaining process, the affidavits suggest that in determining the intent of ILA and the employer defendants issues of fact remain. ILA avers that the sole purpose of the Dublin Supplement was to protect union job opportunities. The vessel owners say that they did not really want the acquired business, and that they therefore lacked the predatory intent required by *Pennington*. We are mindful that summary judgment is generally inappropriate in antitrust cases "where motive and intent play leading roles." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

A second line of authority, however, permits the imposition of antitrust liability without a showing of predatory intent. On the same day that *Pennington* was decided the Court handed down *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), which involved a multi-unit collective bargaining agreement in the food store industry. The agreement imposed on the entire bargaining unit a restriction on marketing hours, a direct restraint on the product market. Jewel Tea Company, a member of the unit, signed the agreement under protest but promptly brought an action for declaratory and injunctive relief against the union. It contended that the marketing hours restraint violated the Sherman Act because it limited the hours during which Jewel could compete with other meat retailers in the bargaining unit. The Court's judgment held that the agreement was exempt from the Sherman Act, but three opinions were filed, each receiving three votes. Justice White, announcing the judgment, in an opinion joined by Chief Justice Warren and Justice Brennan, said that for restraints on the product market, the test of exemption was whether the restraint:

> . . . is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the

national labor policy and is therefore exempt from the Sherman Act.

*Id.* at 689–90, 85 S.Ct. at 1602 (footnote omitted). But if a union demanded, and an employer agreed to, an anticompetitive restraint designed to protect an interest not a mandatory subject of bargaining, White "seriously doubt[ed]" that the antitrust exemption would apply. *Id.* at 689, 85 S.Ct. 1596. Relying on NLRB decisions holding that hours of work were a subject of mandatory bargaining, he then considered whether the restriction on hours of operation was justified by its close relationship to the union members' interest in avoiding night work. *Id.* at 692, 85 S.Ct. 1596. The trial court had found that such operations would threaten that protected interest. Since that finding was not clearly erroneous, Justice White said that the agreement was exempt. *Id.* at 697, 85 S.Ct. 1596.

Justice Goldberg, concurring in an opinion in which Justices Harlan and Stewart joined, proposed a test similar to, although somewhat broader than Justice White's. Goldberg would have held that "collective bargaining activity concerning mandatory subjects of bargaining under the Labor Act is not subject to the antitrust laws." *Id.* at 710, 85 S.Ct. at 1614. He also observed that "decisions of the Labor Board as to what constitutes a subject of mandatory bargaining are, of course, very significant in determination of the applicability of the labor exemption." *Id.* at 710 n.18, 85 S.Ct. at 1614.

The six Justices comprising the *Jewel Tea* majority were thus agreed that when a collective bargaining agreement imposed restraints upon the employer's product market, the most significant issue in determining the availability of the labor exemption was whether the restraint involved a mandatory subject of collective bargaining. Moreover Justice White's opinion suggests that the burden is on the union to demonstrate that the challenged product market restraint is in fact no broader than necessary to promote the union's interest in such a subject. Absent such a demonstration, the restraint must fall. *Ackerman-Chilling-*

*worth, Div. of Marsh & McLennan, Inc. v. Pacific Elec. Contractors Ass'n,* 579 F.2d 484, 503 (9th Cir. 1978) (Hufstedler, J., concurring and dissenting), *cert. denied,* 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979).

The Court's most recent pronouncement on the application of the Sherman Act in the labor context, *Connell Construction Co. v. Plumbers & Steamfitters Local 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), is consistent with this analysis. In that case a labor organization coerced a general contractor into an agreement to hire only those subcontractors who had collective bargaining agreements with it. Like the Jewel Tea Company, the contractor sued to invalidate the agreement under the Sherman Act. The case did not involve a collective bargaining agreement, and so, as Justice Powell carefully noted, considerations peculiar to the collective bargaining context were absent. *Id.* at 625–26, 95 S.Ct. 1830. Nonetheless, the Court analyzed the restraint in terms similar to *Jewel Tea's.* It found that the goal of the agreement—the organization of non-union employers—was legitimate. But the agreement exacted in *Connell,* Powell held, reached too broadly, for it operated as a direct restraint upon the competition of non-union subcontractors, even if their competitive advantage was derived from efficiency rather than substandard wages and working conditions.

> This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws.

*Id.* at 625, 95 S.Ct. at 1836. Despite its explicit distinction of the collective bargaining situation, the *Connell* mode of analysis is similar to that of the *Jewel Tea* majority. The requirements for antitrust exemption are, first, that the market restraint advance

a legitimate labor goal, and, second, that the agreement restrain trade no more than is necessary to achieve that goal. In addition *Connell* clarifies the relationship between unfair labor practice remedies under § 8(e) and treble damage actions under the antitrust laws. Local 100 had argued that the unfair labor practice remedies under § 10(*l*) and § 303 of the Act were exclusive and precluded a suit in antitrust based on a § 8(e) violation. The Court rejected this contention, stating that such remedies were available despite and in addition to the availability of Labor Act remedies. *Id.* at 633–34, 95 S.Ct. 1830.

Were this an action for injunctive relief, we think that *Jewel Tea* and *Connell* would require a summary judgment rejecting the labor exemption. The anticompetitive effect of the enforcement of the Rules and the Dublin Supplement is on this record undisputed. By requiring that LCL and LTL containers be stripped at the dock, the Rules exerted a substantial upward pressure upon the price of container shipping. More important, the Boycott provisions of the Dublin Supplement led to the foreclosure of all LCL and LTL consolidators operating within the forbidden fifty mile range from the entire shipping market between the Port and Puerto Rico. This anticompetitive impact is significant and uncontested. These anticompetitive effects cannot now be justified by their advancement of legitimate labor goals. Six Justices in the *Jewel Tea* majority began the exemption inquiry by asking whether the subject matter of the challenged agreement was itself, or was clearly related to, a mandatory subject of collective bargaining. Whether one prefers the White or Goldberg formulations in *Jewel Tea*, under either a finding that the Rules were not a mandatory subject of bargaining effectively undercuts any contention that they so "fall within the protection of the national labor policy," as to be completely exempt from antitrust scrutiny. *See UMW v. Pennington*, 381 U.S. at 665, 85 S.Ct. at 1596 (White, J.); *Jewel Tea*, 381 U.S. at 689, 85 S.Ct. at 1596 (White, J.); *Id.* at 706, 85 S.Ct. at 1596 (Goldberg, J., dissenting) (all suggesting that whether a par-

ticular union demand is a mandatory subject of bargaining central to a determination of the scope of the labor exemption). Here, the NLRB has held that the Rules and the Dublin Supplement violated §§ 8(b)(4) and 8(e) of the Labor Act. Hence the "direct and overriding interest of unions" in mandatory subjects of bargaining, 381 U.S. at 732, 85 S.Ct. 1596 (Goldberg, J., dissenting), is absent. Nor can it fairly be contended in the wake of that holding that the Rules are protected because they served a legitimate union interest. The NLRB has found that the object of the Rules was work acquisition, an activity that is condemned by national labor policy. *NLRB v. Enterprise Ass'n of Pipefitters*, 429 U.S. 507, 529 n.16, 97 S.Ct. 891, 51 L.Ed.2d 1 (1976). As we noted above, *Apex Hosiery, Allen Bradley*, and *Nat'l Woodwork Manufacturers Ass'n* all indicate that illegal secondary activity of this kind is subject to Sherman Act sanctions.

Although no court has yet had occasion to hold that an NLRB finding of an unfair labor practice precludes recognition of complete nonstatutory antitrust immunity, well reasoned decisions in other circuits support that conclusion. *See Mackey v. National Football League*, 543 F.2d 606, 614 (8th Cir. 1976) (Lay, J.), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) ("federal labor policy is sufficiently implicated to prevail only where the agreement sought to be exempted concerns a mandatory subject of collective bargaining."); *Ackerman-Chillingworth, Div. of Marsh & McLennan, Inc. v. Pacific Electrical Contractors Ass'n*, 579 F.2d 484, 503 (9th Cir. 1978) (Hufstedler, J., concurring and dissenting), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). That result is also consistent with this court's decisions in *International Ass'n of Heat & Frost Insulators v. United Contractors' Ass'n*, 483 F.2d 384 (3d Cir. 1973), *modified*, 494 F.2d 1353 (3d Cir. 1974). *Heat Insulators* was an antitrust suit by AFL–CIO craft locals against a contractors' association and its assertedly "captive" union. Many of the charged antitrust violations, if proven, would also have been un-

fair labor practices. In the court's initial opinion, Judge Forman upheld the primary jurisdiction of the NLRB over those unfair labor practices. He stated that "if the allegations [of unfair labor practices] are true, then such acts would not be immune" under the labor exemption. 483 F.2d at 402. When informed that the Board had already heard the plaintiff's unfair labor practice charges and determined there was no labor law violation, the court vacated its opinion requiring that the district court certify the labor issues to the Board. But it recognized that the NLRB holding that the agreements were legal under the Labor Act was "not conclusive" on the issue of their illegality under the antitrust laws. 494 F.2d at 1354, *citing Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). Taken together the two opinions in *Heat Insulators* suggest that conduct illegal under federal labor law can claim no immunity from antitrust sanctions.

In support of the contrary position the appellees rely principally upon *Commerce Tankers Corp. v. National Maritime Union*, 553 F.2d 793 (2d Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977). There, as here, a clause in a collective bargaining agreement had been held to be in violation of § 8(e) in a prior NLRB proceeding. There, as here, the injured party argued that the NLRB's finding of illegality eliminated the antitrust exemption. The district court rejected the antitrust claim on another ground, and thus did not reach the immunity issue. On appeal, the district court's ground of decision was rejected by the Second Circuit. That court, however, refused to rule that the § 8(e) violation eliminated the antitrust exemption, both because the district court had not considered the issue, and because only one party had briefed it on appeal. It did state in dictum that it did not think that the finding of a § 8(e) violation "necessarily determine[d]" the immunity issue, although it "le[nt] support to appellant's position." *Id.* at 802. The *Commerce Tankers* court's reasons for disposing of the exemption issue suggest that the holding does not have the force of a fully considered decision on the merits. Moreover, the *Commerce Tankers* opinion does not explain why the finding of a § 8(e) violation did not "necessarily determine" the exemption question. Judge Lumbard's cogent dissent, which * M ESSAGE(S) *MORE SECTIONS FOLLO-Wargued a position similar to that adopted here, thus went unanswered. To the extent that *Commerce Tankers* may suggest the possibility that a § 8(e) violation may be completely exempt under the Sherman Act we find it unpersuasive.

Thus we hold that the enforcement of the Rules and Dublin Supplement was not exempt under the Sherman Act. Those agreements are illegal under § 8(e), and under the tests of *Jewel Tea* and *Connell* could be enjoined. If this were an action for injunctive relief brought pursuant to § 16 of the Clayton Act an injunction against their prospective operation plainly would be required. That does not end the inquiry, however, for this is an action, not for prospective relief, but for money damages. As we noted above, the term nonstatutory exemption describes an interpretation of the antitrust laws. Both primary and secondary authorities · discussing the nonstatutory exemption tend to assume that if a Sherman Act violation is shown, then all antitrust remedies are equally available. There is no *a priori* reason why this should be the case. If the Sherman Act itself can be interpreted to accommodate conflicting federal labor and antitrust policies Clayton Act § 4 can be similarly interpreted. We think that a distinction between injunctive and treble damages remedies is warranted.

■ Where an action seeks only declaratory or injunctive relief, a finding that an agreement violates § 8(e) should always remove the antitrust exemption. Once it is clear that a § 8(e) violation has occurred no labor policy is advanced by permitting ongoing operation of an illegal contract, and injunctive relief pursuant to § 16 of the Clayton Act is appropriate. In considering the availability of § 4 relief, however, a more refined analysis is required. For while the agreement which resulted from

the collective bargaining process may have been found to be illegal, it is possible that at the time when the negotiating session took place the parties reasonably believed that their agreement was directly related to the lawful goal of work preservation. That possibility raises a labor policy consideration which the Supreme Court has not yet addressed: the extent to which antitrust exemption should protect not only lawful labor agreements, but also the collective bargaining process. In our view, consideration of the competing public policies which may be implicated indicates the need to recognize a limited labor exemption defense to a claim for money damages under the Clayton Act for conduct which has been held to be illegal under federal labor law.

The decision in *Allen Bradley* not to exempt from antitrust remedies all collective bargaining agreements with a primary employer created a powerful potential sanction against both the union and the employer. Today this sanction provides both parties to the bargaining process with a strong incentive to take into account in their negotiations the public interest in competition in the secondary marketplace. Especially in oligopolistic industries—and Atlantic shipping is one—entirely removing antitrust incentives would place too much uncontrolled economic power in the hands of those at the bargaining table. But the question remains how much antitrust incentive is necessary to encourage the parties to the collective bargaining process to take into account anticompetitive injury to secondary parties. One possible answer is that the § 16 injunctive remedy, coupled with § 303 damage remedy against the union, and the NLRB's unfair labor practice jurisdiction is all the incentive that is required. We think not, however, for while those remedies may provide strong incentive for unions not to make excessive secondary demands, they provide very little incentive to employers to resist such demands. Employers may have no predatory purpose against secondary targets, but may nevertheless be quite willing to sacrifice in the bargaining process the interests of those targets in exchange for concessions on other bargaining issues.

Since employers are not liable for damages under § 303, the only risk they would run from overwilling acquiescence in a bargained for § 8(e) violation would be that either in a § 10(*l*) or § 16 injunctive action they would be made to stop. That would give employers the best of all possible worlds at the collective bargaining table, since they would keep the benefit of the concessions bargained for on other issues, while the risk of economic injury to secondary targets would be borne by those targets and an often shallow pocket union. Complete removal from the bargaining equation of the § 4 incentive to employers to take into account injury to secondary targets would not, we think, be in the public interest.

Nor is there unfairness in requiring employers to resist excessive union claims. Employers are not, after all, without remedies against illegal demands. They can refuse to bargain and the Board will, we must presume, sustain that refusal to bargain. They can accede to the union demand, and then sue, as Jewel Tea Company and Connell Construction Company did, to invalidate the agreement under federal law. Or they can simply refuse to implement the agreement, once adopted, because it is in violation of § 8(e). Any resulting strike pressure might then be enjoined as in violation of § 8(b)(4). We recognize that these remedies may not, in the short run, be as conducive to labor peace as acquiescence. But this court and others have recognized that affirmative obligations imposed by nonlabor federal legislation may on occasion require an employer to resist illegal union demands even at the cost of a strike. *See Atlantic & Gulf Stevedores, Inc. v. OSHRC*, 534 F.2d 541 (3d Cir. 1976).

On the other hand, we recognize that a damage remedy is effective as a deterrent only when its application to an agreement can be foreseen by the parties at the time they are engaged in collective bargaining. Moreover, since the § 4 remedy, while in part compensatory, has a strong punitive element, it may seem harsh to apply it to conduct which the parties had no reason to

believe would ever be held to be illegal, and may even have reasonably believed to be legally compelled. Concern about the lack of meaningful deterrence is particularly relevant when the determination of illegality results from an unanticipated shift in NLRB policy. Antitrust policy may not be significantly advanced by giving retroactive effect, in a damage action, to such unanticipated shifts in interpretation of §§ 8(b)(4) and 8(e). Thus it seems to us that there is room for a defense to a § 4 damage claim that would not be available in a § 16 injunctive action or a government injunctive action.

Casting the issue in terms of an exemption defense to a § 4 damage action affords an opportunity to strike a balance between the interest of parties to the collective bargaining process, and those of secondary targets. If we eliminate entirely the element of foreseeability, and allow a § 4 treble damage recovery whenever the agreement is found to be illegal, the scales tilt too far away from the national interest in collective bargaining over arguably legitimate subject matters. If, on the other hand, we impose too low a burden on those asserting a lack of foreseeability defense, we risk slighting the national interest in deterring anticompetitive injury to secondary parties. The proper accommodation, we think, is recognition, in the collective bargaining context of a defense to § 4 damage recovery involving several elements. Where, as here, a collective bargaining agreement, or conduct taken pursuant to it, has been shown to be illegal under federal labor law, a secondary party injured in his business or property by either has made out a prima facie case under § 4. At that point, to accommodate the labor policy favoring collective bargaining, the defendants may assert, first, that at the time they acted (here, the Dublin meeting and later) they could not reasonably have foreseen that the subject matter of the agreement being challenged would be held to be unlawful under § 8(b)(4) or § 8(e). If they fail to prove that the illegality determination was unforeseeable, the defendants should not be exempt from liability for damages under

§ 4. A successful showing that the determination of illegality was not reasonably foreseeable is not alone enough to establish an exemption defense, however, for *Jewel Tea* suggest that the defendants must also demonstrate that the contract provisions and steps taken to implement them were "intimately related" to the object of collective bargaining thought at the time to be legitimate, and went no further in imposing restraints in the secondary market than was reasonably necessary to accomplish it. Thus our test for the collective bargaining exemption defense to § 4 liability is conjunctive, and objective, and the defendants have the burden on all elements of going forward and of persuasion. The limited § 4 exemption defense we now recognize obviously is unavailable to defendants shown to have acted with the predatory intent against secondary targets referred to in *Pennington* and *Allen Bradley.*

The district court did not consider the summary judgment record in light of the possible § 4 exemption defense we have posited. On this appeal it is inappropriate that we decide its availability, since neither the parties nor the district court focused on the fact issues possibly relevant to it. The defendants' burden of proving lack of foreseeability is formidable, considering the NLRB decision in *International Longshoremen's Ass'n, Local 1248 (U.S. Naval Supply Center)*, 195 N.L.R.B. 273 (1972), which held that the Rules were illegal over a year before the Dublin meeting. Nevertheless, they may be able to establish that a factfinder could believe that the *Naval Supply Center* warning should not have alerted reasonable collective bargainers to a § 8(b)(4) and § 8(e) risk. Moreover, while the provisions in the Dublin Supplement requiring the total withholding of containers from Conex and Twin seem overbroad when compared with the supposed ILA object of preserving the work of stuffing LCL and LTL freight originating with shippers close to the Port, it is at least conceivable that a convincing justification for all the boycott provisions of the Dublin Supplement can be successfully advanced. Thus a

remand is required for the determination of the availability of the limited defense to § 4 liability which we have here announced. If the district court concludes that material issues of fact remain regarding both of its requirements, it may then proceed to a factual hearing. But whether the exemption defense to the § 4 claim is resolved summarily or after a hearing, it must be resolved in the first instance in the district court. A remand is therefore required.

### B. The Claim of Per Se Illegality

If the Rules and Dublin Supplement are held to be nonexempt, the issue of the proper standard of antitrust liability will arise. Conex and Twin contend that if the nonstatutory exemption is unavailable they are entitled to a summary judgment that the Sherman Act was violated. The district court, treating the questions of the labor exemption and the Sherman Act violation as "inseparable," denied it. We hold that the proper method of analysis is to determine the issue of nonstatutory labor exemption separately, as we have done, and then to proceed with conventional antitrust scrutiny of the complaint. The district court also assumed that even if the labor exemption was inapplicable the Rules and steps taken to enforce them must be judged, for antitrust purposes, under a rule of reason standard rather than, as Conex and Twin suggest, as a *per se* violation. The appellants argue that the Rules and Dublin Supplement comprised a *per se* illegal group boycott directed against the LCL and LTL consolidators. We agree.

The defendants suggest that the trend in the case law is to apply the "rule of reason" to concerted refusals to deal. Not all concerted refusals to deal have been held *per se* illegal. Yet in a core group of situations group boycotts have been held to be *per se* violations of the Sherman Act. The Court has condemned as *per se* violations: (1) horizontal combinations of traders at one level of distribution having the purpose of excluding direct competitors from the market, *e.g., Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Eastern States Retail Lumber Dealers' Ass'n v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); (2) vertical combinations, designed to exclude from the market direct competitors of some members of the combination, *e.g., Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); and (3) coercive combinations aimed at influencing the trade practices of boycott victims. *E. g., Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *Fashion Originators' Guild of America v. Federal Trade Commission,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). *See generally, E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178 (5th Cir. 1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); Note, *Boycott: A Specific Definition Limits the Applicability of a Per Se Rule,* 71 Nw. U.L. Rev. 818, 822–23 (1977).

The Rules and Dublin Supplement have horizontal, vertical, and coercive aspects. Under the Rules, the consolidators were required to accede to stuffing and stripping of their cargoes, and later were denied containers altogether. ILA, the vessel owners and the stevedores agreed to exclude the consolidators from providing services which compete directly with the stevedores and with those vessel owners who provide their own stevedoring services. The vessel owners and the stevedores have agreed with ILA to exclude from competition with ILA longshoremen the Teamster stuffers and strippers employed by the consolidators. The NLRB has determined that ILA's goal was "work acquisition." Where the work that the union seeks to acquire is being performed by the union's direct competitors, here the Teamsters, the union's efforts clearly were directed toward the elimination of Teamster competition. ILA, the vessel owners, and the stevedores agreed to coerce the consolidators into changing their method of operation by allowing their containers to be stuffed and stripped at the docks. In every aspect, the anticompetitive effect of this arrangement is clear. The Rules and the Dublin Supplement wholly

bar the consolidators from providing their lower cost services to the shipping market between the Port and Puerto Rico. Nor is there any suggestion in the record that the application of the Rules will in the long run have procompetitive rather than anticompetitive effects. In sum, the Rules and Dublin Supplement are "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *National Society of Professional Eng'rs v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

The defendants also contend that a finding of *per se* illegality is not possible on this record because there is "no showing that the defendants had an anticompetitive intent to exclude plaintiffs from the market or to accomplish any other anticompetitive purpose." NYSA Brief at 43. They point out that the record contains evidence that the consolidators were valued customers of the carrier defendants, and that those defendants made a serious effort to maintain business relations with Conex and Twin even in the face of ILA resistance. The appellees' argument, however, does not accurately reflect the role of intent in civil antitrust cases. If a *per se* violation has been established, the court will already have found that "the nature and *necessary effect*" of the challenged conduct is "plainly anticompetitive." *National Society of Professional Eng'rs v. United States,* 435 U.S. at 690, 98 S.Ct. at 1364 (emphasis added). Once that fact has been established, all that need be shown is that the charged anticompetitive acts were in fact performed by the defendant. *United States v. United States Gypsum Co.,* 438 U.S. 422, 442, 98 S.Ct. 2864, 2876, 57 L.Ed.2d 854 (1978). A showing of a specific intent to harm one's competitors or restrain competition need not be shown. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). Here the "necessary effect" of the container boycott was to drive the plaintiff consolidators from the New York to Puerto Rico shipping market. No further showing of intent is required.

In the alternative the appellees and the dissenting opinion urge that, at least in the context of labor agreements, the *per se* approach should never be applied. The principal support for that view is Professor Handler's statement that "[a] fair reading of *Jewel Tea* satisfie[d him] that the court intended that there be a full-scale rule of reason inquiry in every instance in which a non-exempt activity is claimed to be in violation of antitrust." Handler, *Labor and Antitrust: A Bit of History,* 40 Antitrust L.J. 233, 239–40 (1971). *See also Commerce Tankers v. National Maritime Union,* 553 F.2d 793, 802 n.8 (2d Cir.), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *id.* at 804 n.4 (Lumbard, J., concurring in relevant part). Mindful as we are of Professor Handler's expertise in both the labor and antitrust fields, we do not agree with his approach. Certainly we find no support for it in either the *Jewel Tea* or *Pennington* opinions. Indeed, the three groups of Justices in those cases, while they diverged widely on other issues, appear to have agreed that "settled antitrust principles" would be "appropriate and applicable" to activity found to be nonexempt. *United Mineworkers v. Pennington,* 381 U.S. at 715, 85 S.Ct. 1585 (Goldberg, J., dissenting); *Meatcutters v. Jewel Tea,* 381 U.S. at 693 n.6, 85 S.Ct. 1596 (White, J.); *id.* at 736–37, 85 S.Ct. 1596 (Douglas, J., dissenting). Those "settled" principles include the *per se* rule, where the facts warrant its application. The Supreme Court's intimations thus do not support Professor Handler's view. Moreover, once a court has concluded that the labor exemption does not shield anticompetitive conduct, application of the rule of reason is redundant. The justification offered for application of the rule of reason is the need to recognize, in the antitrust context, labor's legitimate interest in the collective bargaining process. That interest, however, is precisely the same one that must be taken into account in determining the scope of the nonstatutory labor exemption. A holding that the exemption does not apply embodies a judgment that considerations of labor policy are out-

weighed by the anticompetitive dangers posed by the challenged restraint. The proposed use of the rule of reason would, therefore, simply be an invitation to the court or jury to reweigh under a different label the question of the non-statutory exemption. The appellees have suggested no reason why a second such inquiry is necessary or appropriate.

Further, we think that reliance upon broad "public interest" considerations like the advancement of labor policy as a ground for application of the rule of reason is barred by the view of that rule adopted by the Court in *National Society of Professional Eng'rs v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). As the Court stated there:

> Contrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. *Instead, it focuses directly on the challenged restraint's impact on competitive conditions.*

*Id.* at 688, 98 S.Ct. at 1363 (emphasis added). Later in the opinion Justice Stevens repeated the same theme even more forcefully:

> [T]he purpose of both [rule of reason and *per se*] analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry. Subject to exceptions defined by statute, that policy decision has been made by the Congress.

*Id.* at 692, 98 S.Ct. at 1365 (footnote omitted). Since the labor policy arguments advanced to support the application of the rule of reason do not relate to the procompetitive impact of the Rules on Containers and the Dublin Supplement in the shipping market, they cannot remove this boycott from the category of *per se* violations.[18]

Two additional points made by the dissent deserve comment. One is the suggestion that the Dublin Supplement is not a group boycott arrangement to which the *per se* rule should apply because "the union is not a competitor of the shipping association or the stevedoring companies." Dissenting Opinion at 528. That suggestion assumes that the *per se* ban on group boycotts applies only to horizontal competitors. *Klor's Inc. v. Broadway Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), disposes of the question, since Broadway Hale, like the ILA here, was not a competitor of the wholesaler parties with whom it conspired. Like the stevedores, however, Broadway Hale was a competitor of the boycott target. The dissent's other point is that by applying a *per se* rule to employee-labor union boycotts we are somehow giving the union lesser rights than political, religious, racial, or consumer groups which may try to advance their goals by boycott activity. Antitrust regulation of political or religious boycotts may raise important first amendment questions. *See* Note, *Political Boycott Activity and the First Amendment,* 91 Harv.L.Rev. 659 (1978). Those questions are absent here, just as they are absent when commercial organizations, which also have first amendment rights, step over the line drawn by Congress in the Sherman Act. In this case Congress has drawn the line between legitimate and illegitimate labor organization activities in §§ 8(b) and 8(e). We are not prepared to hold that those statutes violate the first amendment. Congress has made no similar statement of policy with respect to political or religious boycotts, and the application of a *per se* rule here is in no way analogous to its application in those contexts.

Thus we hold that the district court erred in rejecting the contention of Conex and Twin that the enforcement of the Dublin Supplement, if nonexempt, was a group boycott and a *per se* violation of the Sherman Act.

### C. Election of Remedies

■ Faced with enforcement of the Dublin Supplement, Conex and Twin not

---

**18.** Even if the rule of reason were to be applied here, the parties have suggested no procompetitive effects which would justify the challenged restraints under a rule of reason analysis.

only filed unfair practice charges with the NLRB, but also filed complaints with the Federal Maritime Commission (FMC) against the vessel owners seeking damages under § 22 of the Shipping Act of 1916, 46 U.S.C. § 821. The FMC complaints were voluntarily withdrawn without prejudice about the time the instant complaints were filed.[19] The appellees now argue that the filing of complaints with the FMC concerning the enforcement of the Dublin Supplement was an irrevocable election of remedies which as a matter of law bars their claim under the Clayton Act. Nothing in either the Shipping Act or the Clayton Act so provides.[20]

In support of their argument the defendants rely upon *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 224, 86 S.Ct. 781, 787–788, 15 L.Ed.2d 709 (1966). There the Court held that although the FMC had jurisdiction over practices unlawful under the Shipping Act, that statute, unlike the Interstate Commerce Act, did not vest exclusive jurisdiction for reparations litigation in the administrative agency. The defendants in an antitrust suit had urged that by authorizing the FMC to approve conference shipping rates Congress had precluded the application of the antitrust laws to the shipping industry. The Court rejected this contention. Recognizing that a stay of the antitrust action might in some cases be appropriate while issues under the Shipping Act were litigated before the FMC, Chief Justice Warren wrote:

> Petitioner's failure to seek Shipping Act reparations does not affect its rights under the antitrust laws. The rights which petitioner claims under the antitrust laws are entirely collateral to those which petitioner might have sought under the Shipping Act. This does not suggest that petitioner might have sought recovery under both, but petitioner did have its choice.

*Id.* 86 S.Ct. at 787–788. The appellees would have us read the last quoted sentence as establishing a rule that the FMC filing was an irrevocable election of remedies. But Chief Justice Warren neither said nor suggested any such rule, and no considerations of policy support it. The purposes of an election of remedies—prevention of double recovery, forum shopping, and harassment of defendants by dual proceedings—are adequately served by a rule that plaintiffs may not pursue both their Shipping Act and Clayton Act claims to a decision on the merits. *Cf. Abdallah v. Abdallah*, 359 F.2d 170, 175 (3d Cir. 1966). It would be both formalistic and unfair to hold that the filing and voluntary dismissal without prejudice of a complaint seeking Shipping Act reparations is a bar to the § 4 Clayton Act remedy, and we decline to do so.

### D. Illegality

 The vessel owners and stevedores join ILA in the assertion that because Conex and Twin lacked ICC permits they cannot recover damages. The reasoning of Part IV. C., *supra*, is applicable here, and will not be repeated. We do note, however, that the case for application of an illegality defense to the § 4 Clayton Act claim is by virtue of antitrust case law even weaker than that for its application under § 303(b). In *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Court held that the defense of *pari delicto* was not a bar to an antitrust suit by distributors challenging restrictive provisions in agreements to which they were parties, except when it could be said that the plaintiffs, acting in their own self interest, were equally responsible with the defendants for the antitrust violations. While *Perma Life* dealt only

---

**19.** Conex and Twin settled the FMC proceeding with TTT, the third vessel owner and dismissed the FMC complaint against it with prejudice. Twin settled its FMC complaint against Seatrain and dismissed its complaint with prejudice as to that defendant only. Whether Seatrain is entitled to a credit for whatever it paid

in reparation for violations of the Shipping Act should Twin establish damage to its business or property is an issue not presented on this appeal.

**20.** *Compare, e.g.,* The Interstate Commerce Act, 49 U.S.C. § 9.

with illegality alleged to be a concurrent violation of the antitrust laws, it has been understood to have abolished the defense of illegality even when the plaintiff's wrongdoing is unrelated to antitrust policy. *E. g., Lamp Liquors, Inc. v. Adolph Coors Co.,* 563 F.2d 425 (10th Cir. 1977) (absence of a liquor license); *Adolph Coors Co. v. A & S Wholesalers, Inc.,* 561 F.2d 807 (10th Cir. 1977) (absence of state and federal beer wholesaler permits); *Memorex Corp. v. IBM Corp.,* 555 F.2d 1379 (9th Cir. 1977) (theft of trade secrets); *Health Corp. of America, Inc. v. New Jersey Dental Ass'n,* 424 F.Supp. 931 (D.N.J. 1977), *mandamus denied without opinion sub nom. New Jersey Dental Ass'n v. Brotman,* No. 77–1268 (3d Cir. Feb. 24, 1977), *mandamus denied,* 434 U.S. 812, 98 S.Ct. 238, 54 L.Ed.2d 162 (1977) (violation of state health care regulations). *Contra, Cottonwood Mall Shopping Center, Inc. v. Utah Power & Light Co.,* 440 F.2d 36 (10th Cir.), *cert. denied,* 404 U.S. 857, 92 S.Ct. 107, 30 L.Ed.2d 99 (1971).

The authorities rejecting illegality defenses not directly related to the antitrust policy in issue in the plaintiff's case recognize the inappropriateness of requiring that the federal antitrust enforcement policy yield to unrelated regulatory policies, state or federal. The ICC permit requirements, which so often are administered to protect existing carriers from excessive competition, have nothing to do with the procompetitive policies of the antitrust laws. As we observed in Part IV. C., *supra,* the ICC has sanctioning authority for the vindication of the public policies which are its responsibility. Additional enforcement at the expense of antitrust policy would not, in view of *Perma Life,* be appropriate.[21]

#### E. Equitable Estoppel

The vessel owners and stevedores join ILA in pleading equitable estoppel on the same theory that ILA asserts in defense to the § 303(b) count. For the reasons set forth in Part IV. D., *supra,* we hold that it is not a legally sufficient defense to Count I.

## VI. NONPARTICIPATION OF THE STEVEDORE DEFENDANTS

The final defense to summary judgment, advanced only by the stevedore defendants, is that they should not be held liable for the adoption and enforcement of the Dublin Supplement, even though they are members of NYSA and are parties to the collective bargaining agreement with ILA, because the record does not contain the clear proof of their complicity required by § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106. Section 6, which applies both in civil and criminal actions, provides that:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

The "clear proof" standard has been applied by the Supreme Court in an antitrust enforcement context. *Brotherhood of Carpenters v. United States,* 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947).

We assume for purposes of this appeal that the acts complained of in Count I qualify as a labor dispute for purposes of § 6, and thus that the clear proof standard applies with respect to the authority of NYSA to act on behalf of the stevedores. As to other facts, such as the existence of a contract or combination, and the injury to the consolidators' business or property, the ordinary preponderance of the evidence test governs. *Ramsey v. United Mine Workers,* 401 U.S. 302, 308–11, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971). But while § 6 binds the federal courts to a clear proof standard on the authority question, neither its text nor any judicial construction that has been called to our attention suggests that it pre-

---

**21.** The appellees also rely on *Maltz v. Sax,* 134 F.2d 2 (7th Cir.), *cert. denied,* 319 U.S. 772, 63 S.Ct. 1437, 87 L.Ed. 1720 (1943). We do not believe that holding survives *Perma Life.*

cludes summary judgment on that question. Indeed the standard of Fed.R.Civ.P. 56(c)—the absence of a genuine issue as to any material fact—is higher than the clear proof standard imposed by § 6, which merely instructs the factfinder how to resolve genuine fact issues.

Contrary to the stevedores' argument, we find no genuine issue of material fact as to the authority of NYSA to act for them in negotiating and implementing the Dublin Supplement. All the stevedore defendants are members of NYSA and it bargains collectively on their behalf with ILA, which represents their longshoremen employees. The NYSA bylaws provide that any agreement negotiated by it is binding on all members unless within fourteen days members refuse to subscribe. The stevedores did not refuse to subscribe to, and thus became parties to, the Dublin Supplement. Any suggestion that they lacked knowledge of the charged group boycott is negated by the letter of April 13, 1973, directed to all NYSA members, including the stevedores, identifying Conex and Twin as violators of the Rules and activating the boycott provisions of the Dublin Supplement. No answering affidavits were submitted suggesting that either at the time of its execution or at the time of its implementation the stevedores took any action to disassociate themselves from the unlawful agreement to which they were parties. There is, therefore, no genuine issue of material fact as to the authority of NYSA to act for all its members, including the stevedores, in negotiating and implementing the contract undertaking a group boycott. The sole question is whether, having become a party to that contract with full knowledge of its contents, they are liable for the injury to the consolidators' business and property resulting from its implementation. We hold that they are.

## VII. CONCLUSION

The order appealed from to the extent that it denied the motions of Conex and Twin for partial summary judgment of liability against ILA on Count III will be reversed, and the case remanded for the entry of such a judgment and for a trial on damages on that Count. Insofar as that order denied summary judgment on Count I against ILA, NYSA and the vessel owners it will be affirmed and the case will be remanded to the district court for further proceedings respecting the availability of the labor exemption defense to the § 4 Clayton Act claim which we have announced, and for a trial on damages on that Count if that defense should prove to be unavailing. Each party shall bear its own costs.

WEIS, Circuit Judge, concurring and dissenting.

Although I concur with the majority's disposition of most of the issues in this case,[1] I am unable to agree that on remand, if the challenged conduct is found to be nonexempt, a per se approach would be proper. Determining the applicability of the labor exemption and choosing the appropriate level of antitrust scrutiny are discrete issues. Accordingly, if it is concluded that the exemption does not apply, consideration must then be given to utilizing a full rule of reason inquiry or applying the abbreviated per se approach.

The fact that the labor exemption does not insulate certain conduct does not make it a violation of the antitrust laws, but simply means that the activity is subject to scrutiny under those statutes. This has been made clear by the Supreme Court

1. I do not dispute that collateral estoppel, to the extent it establishes violations of §§ 8(b)(4) and 8(e), is applicable here. I do not, however, agree with all of the dictum in the majority opinion. I note particularly that in *International Bhd. of Teamsters v. Daniel,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), the Supreme Court cautioned that the weight to be given an administrative agency's interpretation of the statute under which it operates must be limited by a court's obligation to honor the clear meaning of the legislation. I also read *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), as permitting scrutiny of administrative procedures before according collateral estoppel effect to agency decisions.

decisions discussing the labor exemption. In each instance, the Court has carefully separated the exemption inquiry from the ultimate liability determination. *See Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 637, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975); *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 693, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) (opinion of White, J.); *United Mine Workers v. Pennington*, 381 U.S. 657, 661, 669, 85 S.Ct. 1585, 14 L.Ed. 626 (1965) (opinion of White, J.).

I start with the basic proposition that the rule of reason is the prevailing standard of analysis. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir. 1978), and that the per se standard is applicable only in limited situations. As the Court explained in *Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958):

> "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."

The majority opinion correctly points out that some refusals to deal have been classified as per se violations. All of the cited cases, however, reviewed fact situations involving business competitors. The Supreme Court has never held that all boycotts, even those involving noncompetitors are per se violations, nor is there any present indication that that position will prevail.[2] Indeed, in *De Filippo v. Ford Motor Co.*, 516 F.2d 1313, 1317–18 (3d Cir. 1975), we cautioned that a consequence of an overreliance on the "boycott" label would be the indiscriminate extension of the per se principle. The case at bar does not represent a classic commercial boycott because the union is not a competitor of the shipping association or of the stevedoring companies. Its aim was not the elimination of competition but work preservation or acquisition. Concededly, a boycott may include noncompetitors and be a violation of the Clayton Act, but that does not answer the question whether a per se violation is involved. *See St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978).[3]

A political, religious, racial, or consumer group that promotes a boycott of particular products to enforce its aims would not be guilty of a per se violation. In these cases, although the refusal to deal may be intended to inflict some injury upon the object of the boycott, the target is not a competitor of those who have actively urged the restraint. *See* L. Sullivan, Antitrust § 92 (1977); Note, *Boycott: A Specific Definition Limits the Applicability of a Per Se Rule*, 71 Nw.U.L.Rev. 818, 830–32 (1977). *See generally* McCormick, *Group Boycotts—Per Se or Not Per Se, That is the Question*, 7 Seton Hall L.Rev. 703 (1976).

The majority argues that permitting a rule of reason inquiry after a finding of no labor exemption would be redundant. But if a boycott by a political, religious, racial, or consumer group is to be subjected to rule of reason scrutiny, it is difficult to understand why that procedure should be denied a labor union simply because some—but not necessarily all—of the pertinent factors have been resolved in the labor exemption examination. The rule of reason analysis does not duplicate the exemption inquiry in its entirety and should not be forsaken

---

2. *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), though emphasizing the anti-competitive focus of the rule of reason, was interpreting that very precept, not announcing a new per se classification. That opinion, therefore, is of no relevance in determining as an initial matter which mode of antitrust analysis to employ. *See generally* Handler, Antitrust—1978, 78 Colum.L.Rev. 1363, 1364–74 (1978).

3. The courts of appeals have favored the rule of reason in noncompetitor boycott situations. *See* the cases collected in *Smith v. Pro Football, Inc.*, 193 U.S.App.D.C. 19, 593 F.2d 1173 (D.C. Cir. 1978).

merely because there might be some overlap. A union should not be singled out in a manner that would deny it all the opportunities for defense afforded other noncompetitor participants in similar boycotts. Indeed, I find myself in agreement with Professor Handler's view that an automatic finding of antitrust liability after a determination that union activity is nonexempt "would be a *per se* approach with a vengeance." Handler, *Labor and Antitrust: A Bit of History,* 40 Antitrust L.J. 233, 239 (1971). Moreover, some consideration should be given to the other defendants' contentions that the restraint was forced upon them through union pressure and not through any desire of their own.

Perhaps none of the defendants can satisfy the rule of reason analysis, but it is premature on this record to decide whether the restraint violates the antitrust laws. That determination must be made initially by the district court after reviewing all relevant considerations. A shortcut is not appropriate in this case. Accordingly, I would remand to the district court with directions that if the labor exemption is not found to be applicable, the rule of reason should be applied to the antitrust claims.